Peter J. McQuillan, J.
On July 10, 1973, an indictment (No. 3605/73) was filed against defendant charging him with the class A misdemeanor of conspiracy in the third degree, and with the class D felony of possession of a weapon as a felony (6 counts). The latter six counts are of felony grade— rather than a class A misdemeanor — solely because of defendant’s 1965 conviction in United States District Court (SONY).
On January 18, 1974, a second indictment (No. 3605A/73) was filed against defendant charging him with the misde *530 meaner of conspiracy in the third degree (2 counts), the class E felony of criminal possession of stolen property in the second degree (one count), and possession of a weapon as a felony (one count). The two counts of conspiracy are of class A misdemeanor grade — rather than a class B misdemeanor— solely because of defendant’s afore-mentioned decade-old conviction.
The prosecutor’s reason for conducting two separate Grand Jury proceedings, six months apart, involving essentially the same witnesses and the same transactions is inexplicable. The severance serves to obscure an understanding of the issues involved in this otherwise complex case. The prolixity of the pleadings, from a facial examination, suggests criminal conduct far more extensive and grave than what is actually charged. (The motion papers filed in this case reveal that on the day defendant was arrested, certain police officials falsely informed the press that defendant was the head of a named terrorist group.)
The two pending indictments contain a total of 11 counts: three misdemeanor counts of conspiracy; one count of criminal possession of stolen property in the second degree (value exceeds $250); and seven counts of possession of a weapon as a felony.
A close scrutiny of the pleadings, coupled with a careful review of the Grand Jury evidence, reveals the following: two of the three conspiracy counts are, in reality, identical. The legally sufficient evidence before the Grand Jury involving the stolen property supports, at best, a class A misdemeanor charge. While not at all apparent from the face of the two indictments, it is clear that six of the seven weapon counts involve the very same handgun, i.e., defendant is charged in these six counts, under alternative theories, with possessing the same handgun in his home on four different dates. (Three of the four dates are December 30, 1972; February 13, 1973; and July 5, 1973. See Part II, infra, particularly the June 26, 1973 search warrant application.) And finally, the Grand Jury evidence involving all but one of the weapon counts is legally insufficient to support the offenses charged.
In summary, therefore, and without seeking to minimize the seriousness of the essential accusations, this case is concerned with three charges: (1) misdemeanor conspiracy; (2) misdemeanor possession of stolen property; and (3) possession of a *531 handgun in defendant’s apartment (which constitutes a misdemeanor if the accused has no prior conviction for a crime).
Defendant, claiming to be aggrieved by an unlawful or improper acquisition of evidence and having reasonable cause to believe that such may be offered against him in the pending criminal action, has made a motion for an order directing that such evidence be suppressed or excluded upon the ground that it consists of tangible property obtained by means of an unlawful search and seizure under circumstances precluding admissibility thereof in the pending action (CPL 710.20, subd 1). The claim is that the search warrant which formed the basis for a forcible entry into the defendant’s home on July 5, 1973 and the seizure therein of certain property was constitutionally invalid.
Defendant has also made a motion to dismiss the aforementioned indictments pursuant to CPL 210.20 (subd 1, par [i]) on the ground that such dismissal is required as a matter of judicial discretion by the existence of some compelling factor, consideration or circumstance clearly demonstrating that conviction or prosecution of the defendant upon such indictments would constitute or result in an injustice (CPL 210.40, subd. 1). The reasons asserted in support of this motion include the gross impropriety of an undercover detective — assigned to an intelligence gathering unit within the Police Department — infiltrating the Lower East Side community of New York County, without any cause or guidelines whatever, and then during a two-year period of daily and indiscriminate spying on a multitude of citizens and community groups, particularly and impermissibly focusing on the defendant and those associated with him, engage in such police-State conduct as surreptitiously obtaining duplicate keys to private premises, conducting constitutionally proscribed searches and seizures, and engaging in other widespread malfeasance inconsistent with those basic values of privacy and freedom of association cherished by an open and free society.
A five-day hearing was conducted before me on April 11, 14, 15, 16,. 17, 1975, on the search warrant motion (CPL 710.60, subd. 4) and the dismissal motion (CPL 210.45, subd. 6; People v Clayton, 41 AD2d 204). The principal prosecution witness was Detective Oswaldo Alvarez. From May, 1971, to July, 1973, he acted continually as an undercover operative throughout the Lower East Side community. He prepared *532 daily intelligence reports of what he heard and observed. Five hundred thirty-four such handwritten reports were introduced into evidence at the hearing.
Report No. 1 is dated May 18, 1971. Report No. 534 is dated July 5, 1973. Although it is a long and tedious task, it is essential that each of these detailed reports be closely read and carefully studied in order to capture the extensiveness of the governmental infiltration that occurred in a residential area of our city during most of 1971, all of 1972, and the first half of 1973. The effect of such studied effort is to capture what could otherwise go unapprehended by a hurried reading of a listing (infra) that simply includes selected but lifeless detail from certain of the reports.
In April, 1969, defendant and others were arrested by police officers assigned to the Bureau of Special Services (BOSS) after an indictment had been filed charging, inter alia, that they had "an over-all plan to harass and destroy the elements of society which the defendants regarded as part of the 'power structure.’ ” The case — often referred to as the Panther 21— proceeded to trial and terminated in an acquittal of all defendants on May 13, 1971. The jury deliberated for about two hours.
The defendant remained continuously incarcerated for over two years until his acquittal. (No jail time credit would be accorded defendant for these two years of imprisonment if he were convicted of the crimes charged in the pending indictments.) The Panther 21 case has been described as the longest criminal trial ever conducted in New York State. That case has been the subject of at least three publications. See, e.g., Zimroth, Perversions of Justice: The Prosecution and Acquittal of the Panther 21 (Viking, 1974).
The present case against defendant, a long-time activist in community affairs in the Lower East Side, represents the third time within eight years that charges have been made against him as a result of a protracted investigation by an undercover operative assigned to BOSS. Zimroth (op cit, pp 47-48) has described this secret intelligence gathering unit as follows:
"BOSS was formed in October 1912 under the name Radical Bureau, and in the decades which followed, it changed names several times: the Neutrality Squad in 1915, the Radical Squad in 1923, the Bureau of Criminal Alien Investigation in 1931, the Public Relations Squad in 1945, the Bureau of *533 Special Services and Investigations in 1946, the Bureau of Special Services in 1955 * * * But its function remained essentially the same — to investigate and control trouble-making subversives, whoever they happened to be. During World War I, according to * * * Anthony Bouza, a former BOSS official, it was the 'bomb throwers, German agents, and anarchists’; after the war it was the Communists and the labor agitators; during World War II it was the 'bundists, fascists and other extremist groups.’ In the 1950’s focus shifted back to the Communists, but, according to Bouza, the agency settled into a 'rut of inactivity and disuse.’ The FBI had preempted the 'espionage area’ and the 'Communist field,’ it seemed, and left BOSS with little to do.”
" 'The Sixties’, according to Bouza, 'burst with fury upon the city’s life,’ and with the burst came a reorganization and revivification of BOSS. The Bureau was remarkably successful in infiltrating radical groups on the left and on the right throughout the decade, and it was especially good at putting police agents into the myriad black groups that blossomed in the city.”
"An agent was directed first to 'establish’ himself in the community — get an apartment, play ball in the schoolyards, participate in community activities. Then, upon direction, he would try to join the target organization, participate in its activities, perhaps get arrested once or twice to establish his credibility. The agent would sometimes hop from one organization to another. 'The thread of subversion that runs through Black America, involving a minuscule minority of American Negroes, takes many turns and has many interconnecting points,’ says Bouza. Ray Wood, one of the Bureau’s more successful agents, first joined CORE in the Bronx. He was arrested and convicted for his part in a plan to effect a citizen’s arrest of Mayor Robert Wagner. He then was directed to join the Revolutionary Action Movement and was a member of that organization until the work of other agents led to the arrest of sixteen members for planning to assassinate Roy Wilkens, Whitney Young, Jr., and others. 'Adorned with the credentials of an arrest and conviction,’ Wood moved on to the Black Liberation Front, where his activity led to the arrest and conviction of a group planning to blow up the Statue of Liberty.”
The defendant, part of the referred-to arrested group, was convicted in 1965 of conspiracy. It is this conviction, as noted *534 earlier, that raises the grade of all the weapon charges in the present case from a misdemeanor to a felony, and the grade of two of the three conspiracy charges from a class B misdemeanor to a class A misdemeanor.
The defendant’s widespread, serious involvement in community affairs is essentially conceded by the undercover operative who testified at the hearing. This testimony simply corroborates statements of the defendant’s reputation that are part of the moving papers. Such data are relevant to an understanding of the sweeping scope and intensity of the police infiltration involved in this case. A selected sample follows:
1. President, New York City Health and Hospitals Corporation: "His persistent advocacy for quality health care in the municipal hospitals has been positive and effective * * * Mr. Collier presently holds an important leadership position on the Bellevue Board. The subcommittee he chairs is vitally important not only to the consumers, but also to the administrative and medical components in the hospital.”
2. Planning Associate, The United Presbyterian Church: "quite impressed by his understanding and analysis of the problems of our society and his commitment to change * * * Bob is a very valuable member of our community of people who are not content to ignore poverty, hunger, disease, war and injustice. His commitment is deep and genuine.”
3. Executive Director, Gouverneur Hospital: "has been active and concerned in community affairs in the Lower East Side.”
4. Director, Medical Care Research Unit, New York University School of Medicine: "I became acquainted with Mr. Robert Collier approximately three and half years ago because of my involvement with community health agencies and educational institutions in the Lower East Side of Manhattan. * * * I came to respect his knowledge when we served as fellow officers on the Bellevue Hospital Community Advisory Board. I have come to have great confidence in his honesty, his integrity and his desire to protect the safety and well being of the students with whom he works, especially when he has been responsible for setting up placements in relatively unsafe parts of New York City.”
5. Professor, SUNY": "His personal goals and aspirations are in social work and community services and they are consistent with his intellectual talents.”
*535 6. Administrator, Community Relations Department, New York City Health and Hospitals Corporation: "He has proven himself to be a most reliable, responsible and intelligent individual. Mr. Collier has been elected to the National Executive Committee of the Medical Committee for Human Rights and has continued to carry out the commitments required by the position. * * * [This Committee] is a national organization with 10,000 members, most of whom are health professionals concerned with the availability of decent, quality medical care for the people of this country.”
7. Internist, Dr. Martin Luther King Jr. Health Center: "I have met very few individuals in the health professions who are as concerned and committed as Bob to the task of developing a decent health care center.”
8. Physician, Morrisania Hospital: "As we share a common interest in community health, we have worked together on several educational projects. Specifically, we planned several conferences and forums on vital health issues in New York City under the sponsorship of the Medical Committee for Human Rights * * * I find that he is honest, hardworking, and a responsible citizen.”
9. Minister, Presbytery of New York City: "In my neighborhood, it was hard not to be acquainted with Bob Collier. He was all over it and had everywhere a reputation for doing good.”
10. Executive Director, Bellevue Hospital Center: "Mr. Robert Collier has been a member of the Bellevue Hospital Community Board since September 1972 and has held various officerships and committee chairmanships since its inception. He has proven to be an interested and responsible member of the Board and a worthy advocate for improving patient services. He is respected by his fellow board members and has shown considerable leadership abilities. In summary, I would <> state that his activities with the Bellevue Hospital Community Board represent a substantial community service.”
11. Assistant Director, Medical Support Services, Bellevue Hospital Center: "Mr. Collier is highly regarded by his peers and all hospital staff with whom he has reason to become involved; he is noted for his sincerity and dedication to the hospital ideals and objectives of caring for the sick and injured in the community.”
12. Co-ordinator, Community Medicine Program, New York *536 University Medical Center: "I have known [Robert Collier] for eight years. Bob has been a neighbor, a parent and an active community worker. We met when both of our daughters were in a day care center, in 1968. He has been actively involved in all phases of community life. In a neighborhood recreation center, he was the Director of Tompkin Square Community Center. He has been involved with the schools and the health facilities. * * * Bob has * * * committed himself to upgrading the quality of life and cohesiveness of the Lower East Side Community.”
I
The infiltration of the Lower East Side by Detective Alvarez began in less than one week after the Panther 21 acquittal.
One BOSS official was asked at the hearing to state the purpose of having Alvarez work undercover in the Lower East Side. He replied: "The purpose was to investigate an organization known as the Young Lords’ Party.” Alvarez, however, denied that he was requested to do this at the outset of his assignment: "In the beginning I was just assigned to get known to criminal activities. Later on I was asked to make myself aware to, let’s say, a Young Lord’s office which was located in the area.” He testified further: "I was there to observe and overhear anything, not investigate * * * To learn things” His goal was to report to BOSS "everything that I remember.” A BOSS official testified: "The investigation took action as the way things developed.”
Alvarez described his undercover work with the Young Lords as follows: "Whatever they did, you know, whatever program they had, you know, whether hand out leaflets, I’d go along with them.” His contact with the Young Lords "didn’t last too long” because "they closed * * * [T]hen I was another guy in the street.”
The BOSS official was asked at the hearing if there was any suspicion of any criminal acts, or if BOSS had probable cause or anything like that to believe that a crime was being committed by the Young Lords organization. He replied: "I had been directed by my superiors to have him infiltrate the Young Lords. There had been reason to believe that they were a potential source of problems in the public security area, to the best of my knowledge.:
"Q. Was there anything specific that * * * Detective Alva *537 rez was to find out, or was it just a general intelligence infiltration?
"A. I was assigned to have him infiltrate the Young Lords, sir, and then what he found out we had this information.
"Q. You weren’t told to find out anything specifically, just to have him infiltrate and report to you the activities that he saw and overheard?
"A. Yes, sir.
"Q. There was no particular crime under investigation, correct?
"A. I wasn’t investigating a particular crime, no sir.”
At one point, near the end of the two-year period of infiltration, the Police Commissioner promulgated guidelines concerning undercover operatives (see The New York Times, Feb. 9, 1973). At the hearing, a BOSS official was asked if he was aware that these guidelines require some probability of certain crimes being committed before an infiltration like that conducted by Alvarez could be undertaken. He replied:
"A. There are guidelines, sir, but I wouldn’t quote them now, but there are guidelines.
"Q. And those guidelines came out after Detective Alvarez was sent in to the Lower East Side?
"A. Yes sir, to the best of my knowledge.
"Q. * * * do you know when they were issued?
"A. I couldn’t tell you now, sir.
"Q. At the time the guidelines were issued, was there any reassessment or meeting to discuss whether Alvarez’s infiltration into the lower East Side community should end or should continue? Anything like that?
"A. I don’t recall, sir. I don’t think so.”
A BOSS supervisor testified at the hearing as follows:
"Q. Now did you learn of any guidelines with respect to when this Special Services Office decides to send an undercover agent to infiltrate or penetrate or get close to groupings of people?
"A. There are intelligence division directives * * *
"Q. And there is one from former Commissioner Murphy having to do with guidelines as to when an undercover operation can be begun. Are you aware of that?
"A. There is approval necessary. I don’t know if the Commissioner has it.
*538 "Q. Well, do you know whether this investigation, namely with the undercover operation concerning Alvarez, was prefaced by any criminal activity that warranted, namely did anything occur that would require the Police Department to send an undercover agent into a group or an area?
"A. I didn’t know. I don’t know what criteria was used to institute the investigation, no.”
Alvarez worked undercover in the Lower East Side from May, 1971 until July, 1973. He occupied a rented apartment in the neighborhood. "Periodically * * * I would take odd jobs * * * Painting, peddling trinkets, things of such nature.” He described the community’s ethnic makeup as "predominately Puerto Rican, black, and some Jews.”
When asked if he was directed to assimilate in any particular part of the Lower East Side, Alvarez replied: "Just generally the lower East Side, to establish knowledge of the area and what not.” He said that he "started out by going to Tompkins Square Community Park, and trying to go where there were crowds, and trying to get introduced to people.” The instructions given to him by BOSS were these: "To go into the neighborhood, establish a residence, become a member of the community and * * * attend meetings.” License plate numbers were memorized and reported. Photographs were taken. A BOSS official testified that he asked Alvarez "to report what he thought was important.” The same official testified that Alvarez "was directed to report the activities of the individuals he was with, when he was with them.”
Alvarez testified that he understood "the purpose” of his infiltration to be as follows: "to discover any criminal activities within the area, may it be one thing or another * * * Basically, to discover, if possible, there are any guns, or if there is a foreseen rally somewhere, to probably foretell if there is going to be any disturbances, and possibly some kind of public security would be kept in mind.”
In the summer of 1971, Alvarez said he "was introduced to Collier * * * I had an awareness of who he was.” He said he was initially told by BOSS officials to stay away from defendant: "it came to a point that I could not avoid him * * * his actually starting to physically show me pistols.” However, the latter incident allegedly occurred some 14 months after Alvarez first met defendant, and after many, many contacts with defendant.
The daily intelligence reports by Alvarez indicate that *539 immediately after he met defendant in 1971, his contact with defendant increased and it becomes clear that by the end of 1971, defendant was a chief focus of the infiltration operation. No articulable, credible reasons have been given to warrant the magnitude and the breadth of the undercover operative’s activities as revealed in this case. This conclusion is inescapable from the evidence at the hearing.
Alvarez was asked at the hearing how it came to be that his contacts with defendant intensified. He replied: "Well, through my acquaintance with Herman Lopez and in conversation with Herman Lopez, I learned that there was — there was some sort of organization trying to — attempts being formed, and during this time I had witnessed Lopez with firearms and he, in turn, introduced me to Collier, who supposedly was indirectly in control of the whole ballgame.” The "catch 22” quality of this answer, pregnant with innuendos — and not atypical of much of the evidence supporting the charges, particularly the conspiracy counts — becomes apparent upon a close second reading of the answer: "some sort of organization trying to” do what? "Attempts being formed” by whom? When? Where? Does the adverb "supposedly” connote anything more than a tentative assumption? Finally, how can any one, in an American court of law, deal with an accusation that he "supposedly was indirectly in control of the whole ballgame”? The elusiveness of the charge is something Kafka’s characters might recognize — something hauntingly similar to accusing a person of having an "over-all plan to harass society’s power structure.”
During his two years of infiltration Alvarez testified that he sought to create a certain image: "I portrayed myself as a guy that was game * * * I wanted to give * * * the impression that I was game * * * I was the type of individual that if you are into something I wanted to portray the act that I wouldn’t mind getting involved. * * * That I would not just say something, I would go through with it.” For example, Alvarez engaged in a mock gun robbery of another detective on lower Park Avenue in order to "prove myself’ to a certain person.
Alvarez testified that he "cannot recall” telling another person that he "would like to burn down Rockefeller Center.”
Alvarez also testified as follows: "If someone offered me a gun for sale, I’d buy it. If someone presented me with a gun or saying he could come up with a gun, I, you know, I pressed the situation to find out how much truth there was to it * * * *540 I would, you know, pursue it.” On one occasion "George presented me with a pen gun and he said that he had someone that was selling them and I said to him * * * I wouldn’t mind buying one and he said he would try to get, you know, set it up for me.” George never "set it up” and whenever Alvarez "ran into” George he would ask him "whatever happened to that deal you were talking about.”
The defendant, however, strongly disapproved of Alvarez’s feigned image:
"Q. Mr. Collier tried to reform you, so to speak, by offering you jobs, by trying to get you involved in community activities or political activities during the time that you were undercover; isn’t that a fair statement?
"A. Yeah.”
Although his image was that of a youth "game” for anything, Alvarez detailed at the hearing the efforts made by defendant to "reform” him, e.g., defendant tried to get him "interested in carpentry and things like that.” "He wanted me to have my own money.”
On one occasion Alvarez told defendant he was interested in photography, and defendant made efforts to have Alvarez receive vocational training in film-making so that he could be involved in making films of health and housing problems in the Lower East Side. But Alvarez never pursued it: "I wasn’t interested in learning video tape, period.”
Defendant also got Alvarez a job with the Board of Elections: "I think I worked one evening at an election site.” Defendant also tried to get a job for Alvarez at the Hunts Point Market, on the waterfront, and with the Children’s Aid Society: "I think [defendant] had some kind of friendship” with an official of this latter organization; "putting a good word in.”
Defendant also tried to get Alvarez involved in the Bellevue Hospital Advisory Board: "He wanted me to go around and work to bring out votes, you know.” But Alvarez consistently resisted defendant’s effort to involve him in improving the quality of life in the Lower East Side.
Alvarez testified further: "He referred to me about getting involved with the youths. I want to make it my point of view that I did not want to get involved with youths * * * I tried to bring across that I was willing to get involved with something or someone, but you know, of an older crowd of people. That’s *541 what I was trying to emphasize then * * * Leave that impression that I would, I was looking for something a little more — I can’t, you know, reach for the word.”
Fourth Amendment violations during the infiltration mission were flagrant. One report by Alvarez reads as follows: "The assigned visited [a specified apartment]. The assigned went through some of the papers belonging to [the tenant] such as letters from Mentals [sic] Patiants [sic] Liberation Program. The assigned also took from the apt. 2 pictures: one of [the tenant] and another of a unk/m/w that was together with [tenant’s] picture.”
On another occasion, while babysitting alone in defendant’s apartment at the request of defendant’s wife, he looked under a mattress. He explained: "I searched for the weapon that I had recalled Collier putting under the mattress * * * two days before.” No gun was uncovered in this warrantless search. When asked if any police official ever told him not to engage in a search or to pick up a mattress while alone in another person’s home, he replied: "I was, basically, you know, on my own * * * I don’t recall being told what, you know, exactly. I was out there on my own at the time.”
At another time, while alone in defendant’s apartment, Alvarez reached into a closet and felt covered objects. He said: "it was a closet with a curtin. And the curtin was always opened * * * So you could always see, you know, what was in there if there was anything in there.” He was asked what he did after reaching into the closet. He replied: "I can’t recall. I might have, you know, picked up a piece of paper, something like that. I can’t recall exactly what I did after that.” His report for that day reads: "The assigned didn’t make a complete search of the closet.” At the hearing, he explained the reason for his restrictive exploratory inaction that day as follows: "I didn’t want to disturb anything in the apartment * * * If there was something I could see, I would have loved to have seen it.”
On another occasion, while visiting defendant, he looked in a shopping bag that defendant’s wife brought into the home and confirmed that the bag contained grocery items.
While an invitee in a person’s home, Alvarez was requested to look for an athletic uniform. This incident is detailed in his daily report, and concludes with the observation that because of the named occupant’s "presence, the assigned did not make a proper search.” At the hearing, he sought to explain away *542 the lapsus calami as follows: "I wrote it as a search, but I, you know, I may not have meant it that way.”
When persons were seen speaking with defendant, the event and the conversation if overheard — ("I can’t read lips. I wish I could have”) — would be reported. Such reports are voluminous and detailed. For example, Alvarez reported that a specifically named individual was speaking to defendant: "I heard them talking in reference to a local school board meeting.” BOSS officials displayed a particular concern for "individuals that were associating with” defendant.
Whenever he reported that a person was observed speaking to defendant, Alvarez would later look at photographs shown him by BOSS officials in an attempt to identify such person. He explained the procedure this way: "Well, if I stated a name to them, they would show me a picture later on to say 'Is this the person you’re referring to as so and so?’ And I would say yes * * * Well, if I described the individual as a black male, they would show me a picture of a black male * * * I seen a lot of others. You know, I can’t recall, you know; pictures of demonstrations and things like that. I don’t know if it was referring to Collier * * * If I would say anything, for instance, I mention a name and then they try to see if that was the person I was talking about or, you know, was it or wasn’t.”
Whenever, he was in defendant’s apartment Alvarez would look at "literature or anything that was visible.” He explained: "What I seen, I read, you know, anything that striked interest.” He testified further: "Well, I looked around the apartment every time I was actually there, really * * * If I was in the apartment, anything that was, you know, visible or I would not, you know — I would attempt to, you know, maybe read something a little more thoroughly or something like that, yes.”
He reported to BOSS officials, seemingly, each and every movement by defendant during the two-year infiltration, e.g., defendant’s effort toward winning admission to college, the presence of "political” pictures, books and leaflets in defendant’s home and such minutiae as that defendant and his wife "went to the movies,” or that they were going to Brooklyn to visit her family.
The hundreds of daily reports submitted by Alvarez to BOSS concerned the private and personal affairs of citizens other than defendant and his wife, e.g.,: "I recall reporting when people went to the beach and they invited me or they *543 didn’t invite me or things like that, yes. I reported other people, yes.” One report stated that he and another person "visited FDR Drive & 23 St. to look at the persons bathing in a swimming pool.” When persons indicated that they knew defendant, this information was immediately relayed to BOSS.
Alvarez frequently attended local community meetings involving school boards, housing, health centers, hospitals, youth agencies, etc. Detailed reports of his observations were submitted to BOSS. For example, on one occasion, he reported being present for two and one-half hours at the Nathan Strauss Community Center on a day when a local board election was taking place. Among the persons described as being present at the Center was a specifically named official of the American Arbitration Association. Alvarez concluded the report of his observations as follows: "The assigned was not able to attain the results of the elections.” On another occasion he attended a conference on housing and stated in his report that he "assisted in the taping of a tenants workshop meeting.” One report stated that a "Mrs. Rockafella” was a member of the board of a certain community agency.
While attending a lawful community meeting, Alvarez reported, inter alia, that defendant "was in deep thought. Operative feels that he needed Lopez for something.”
Another report reads as follows: "At 8:30 p.m., the assigned departed, and before leaving Collier asked the assigned to be around more often in the evenings because there was a couple of things he wanted to take care of. When the assigned asked what kind, Collier seem to shy away from the reall [sic] answer.”
On another occasion — again confident that he knew what went on in defendant’s mind — Alvarez reported that defendant "seemed to have something on his mind.”
At a school meeting on Avenue D, at which "a lot of people were present,” Alvarez reported what defendant did at the meeting including the observation that defendant’s "facial expression became very serious” when two men entered the hall. The names of persons present at this meeting were, of course, reported to BOSS. He described defendant’s participation in this lawful community meeting involving education as follows: "He was mentioning something about how to go about planning this take over and more or less giving, you know, dos and don’ts.”
Alvarez reported that a named woman had been "offered a *544 job or something to work along with the kids from the community.” When asked how this information was of value to BOSS he replied: "She had a building, she was in control of a building somehow or another with the youth that lived * * * on Third Street somewhere and she had a great influence on them and they were a lot of youths that were involved in that building were of 15, 14 and, you know, 16 years of age, with gangs and they were, you know, and I recalled her as, you know, as being the link between them and anyone who wanted her to influence them on doing something, yes.”
The making of duplicate keys to person’s home and other constitutionally protected premises was an apparently routine practice. E.g., Alvarez made a duplicate key to the work shop of a community organization on Cherry Street where "young kids in the neighborhood were taught carpentry skills,” and where defendant "was working with those kids and teaching them some of those carpentry skills.”
Alvarez also made a duplicate key to the offices of the Association of Community Services Center on Avenue D where defendant was a salaried employee for the greater part of the two years that Alvarez worked undercover in the Lower East Side. Alvarez said he visited this particular place "many, many times.”
Alvarez also made a duplicate key to the apartment of a friend of the defendant. All of these duplicate keys were forwarded to BOSS officials who have retained them, presumably, to this very day.
A BOSS official testified at the hearing that he gave these instructions to Alvarez: "if there is going to be a place you are frequenting often, we want a key; so that if we have to get in there fast, we don’t have to be worried about sledge hammers and everything.”
Alvarez’ other spy activities during his two-year clandestine sojourn in the Lower East Side included, surreptiously taking samples from a typewriter in defendant’s home, and the home of another person; removing and examining papers from a "found” wallet; removing an address book from a person’s coat pocket and copying the names, addresses and telephone numbers listed in this book; taking a "scratch paper” — containing an address and a telephone number — which he "found” in a person’s home; while a guest at a person’s home, he examined certain papers after the homeowner "stepped outside to walk his dog”; while a guest at another home, he opened a brief *545 case and copied a name and telephone number that was "written on a slip of paper” after the homeowner temporarily left the apartment to take "some clothing to wash.”
Alvarez practically conceded the defendant’s extraordinary interest in community affairs. He knew that defendant was active in the North East Neighborhood Association (NENA), a community health care agency. Alvarez testified that he was present at one meeting of this organization "involving budget problems or something of that nature.”
Alvarez testified that defendant showed films to youths in the community; that defendant "had concern about the drugs. Talkdd about it constantly, trying to get the community rid of drugs, telling people to keep away from it and things like that.”
Alvarez testified that he was aware that in the 1960’s, defendant "organized the Tompkins Square Community Center, ran it, opened it up to the community, fixed it up, and was the head of it”; that defendant was involved with Mobilization for Youth; that "he brought youths to * * * a building on Cherry Street to learn how to work with tools”; that a priest in the area talked to Alvarez about defendant’s "reputation as a good community worker”; that a physician told him that he could get 100,000 residents in the Lower East Side to say that Collier was a good community worker.
Alvarez also testified that he knew that defendant was elected to the Advisory Board of Bellevue Hospital and later became its chairman. "When I was with him and he did speak or, you know, visit Bellevue Hospital Advisory or whatever it was, to do with Bellevue Hospital, I reported on it.” Many of the daily reports reveal Alvarez to be present in the hospital’s Administrative Building for hours at a time.
Alvarez testified that there were dozens of instances when defendant talked to people about the Bellevue Hospital Advisory Board "trying to figure out what to do, what the Advisory Board’s role should be, who should be members, all kinds of conversations about budgets and things like that.”
Alvarez reported to BOSS that defendant was elected co-chairman of the Parent’s Union for School Board District No. 1. He also reported that he was present with defendant at a local school board meeting when the District Superintendent said defendant was being considered for a job in a drug program.
*546 Alvarez reported to BOSS officials that defendant "was very excited about the thing he had accomplish with the school board and the Bellevue Hospital Advisory Board, and that things were really rolling.”
Alvarez reported that defendant tried to establish a hospital patient’s union; that defendant was chairman of the Lower East Side Health Council.
He reported that defendant tried to get government funding to help street gangs. "He wanted to direct their activities * * * in different directions other than fighting within themselves.”
Alvarez reported that defendant disagreed with Bellevue Hospital’s plan to convert the prison ward into a research section; that defendant was seeking community support to fight the proposal; and that he asked Alvarez to get involved with "the struggle.”
Alvarez reported that defendant was "preparing films on the problems of housing and health programs on the lower east side.”
He reported that he attended a meeting of the members of all the health advisory boards throughout the city, and that defendant participated in a panel discussion. When asked at the hearing if he attended this conference in his official capacity, Alvarez replied: "I was always working as a police officer.”
II
Detective Alvarez was required to submit his daily reports to BOSS through Det. James Oliver, "his control.” Thus, Det. Oliver had read all of the reports prepared by Alvarez, and presumably was familiar with their contents.
In late June, 1973, it was decided by BOSS officials that Alvarez’ two-year infiltration mission would end. A decision was thereafter made to prepare a search warrant for defendant’s home: Apartment 11, 217 East 2nd Street. Det. Oliver testified: "It may have been at my solution — my urgings that if Detective Alvarez was going to surface, I wanted to get the gun that might be in Robert Collier’s apartment.”
On June 26, 1973, Det. Oliver prepared an application for a search warrant. The relevant portion of that application reads as follows:
"I have received information from a police officer, shield *547 24646 assigned to the Intelligence Division in an undercover capacity that on December 30, 1972 between 1:15 and 2:15 p m, he was in apt. 11, 217 East 2d Street, New York County with one Arthur Moy, Robert Collier gave Arthur Moy a 9 mm Walther P-38 Pistol # 1423E, telling Moy to give it to the undercover officer to hold for safekeeping. I am further informed by said undercover that on February 13, 1973, he visited Robert Collier at the aforementioned address, and that at 6:15 to 6:45 p m Robert Collier asked for the return of said Walther P-38 pistol. I am further informed that the undercover officer returned to his home, got said pistol, and returned it to Collier at 7:15 p m in apt. 11, 217 East 2d Street. Collier loaded said Walter P-38 to see if his ammunition fit it, unloaded the gun, and put it in a black clothing dresser.”
This June 26 application was rejected by a Judge of the Criminal Court. It is clear beyond peradventure that "staleness” was the basis for the rejection. But neither Oliver nor any other BOSS official recalls why the June 26 application was denied.
The next day — June 27, 1973 — another application for a warrant to search defendant’s home was prepared by Oliver. The final paragraph of this sworn application inexplicably contains this statement: "No previous application in this matter has been made in this or any other court or to any other judge or justice.” Such statement is not immaterial boilerplate. If it is not true, the applicant exposes himself to a perjury prosecution (see Penal Law, § 210.30, subd 2).
The relevant portion of this so-called June 27 application reads as follows:
"I have received information from a police officer, shield 24646, assigned to the Intelligence Division in an undercover capacity that on June 19, 1973, between the hours of 12:30 A.M. and 1:30 A.M. he was in apartment 11, 17 [sic] East 2nd Street, New York County. Also present in said premises were Robert Collier, Priscilla Low, Arthur Moy, Willie Saltren and Juan Melicio. While therein the undercover officer observed what appeared to be the butt of a gun protruding from a space between a sleeping mattress on the floor and a wall. The undercover officer laid on the mattress and did see aforementioned gun butt protruding from a white linen cloth. The undercover officer put his hand between the wall and the mattress and did feel a long barreled handgun.”
This application was granted and a search warrant was *548 issued the same day authorizing the seizure of "a long barreled hand gun.” The warrant was executed July 5, 1973. It is the property seized during the execution of this search warrant that defendant now seeks to suppress, viz., a handgun, a mimeograph machine, a projector, a speaker, and a "note book containing addresses.” Of course, only a handgun was specified in the search warrant.
In a recent opinion I alluded to society’s need to neutralize the intensifying proliferation of handguns (People v Santana, NYLJ, April 21, 1975, p 14, col 6); a subsequently conducted Gallup Poll survey showed that 44% of all households in this nation own at least one firearm (The New York Times, July 6, 1975). In that opinion I stated that the "sheer urgency of the handgun problem, alone, may never, of course, warrant a dilution of the Fourth Amendment. The granting of a suppression motion made by a relatively few palpably guilty offenders is simply the dues we pay for living in a free society.”
It strains plausibility that no police officer connected with this case can furnish any reason — cogent or otherwise — why the first application (containing data more than four months stale) was rejected and why a second application submitted the next day suddenly and inexplicably alleges data that is only eight days old.
Oliver was asked why it was necessary for him to prepare a second application. He replied: "Well, if I remember, if I recall why the other one was rejected, then I would also be able to recall what the changes were I was going to put in the new one. I don’t recall, sir.” He does not "recall anybody saying to [him] that the information is not current, it’s stale, [or] anything like that.”
A supervising officer from BOSS, who was present in defendant’s unoccupied home on July 5 when the search warrant was executed, testified that the seized handgun was found in a clothing dresser. Significantly, this is the same place mentioned in Oliver’s rejected June 26 application. No gun was found near a mattress — the place specified in the approved June 27 application.
This BOSS supervisor was asked if he knew why Oliver’s June 26 application was rejected. He replied: "I don’t know what — I know there was a draft rejected. Why, why technical, legal reasons, I didn’t know * * * I really don’t recall what was wrong with the language in the draft.”
He was asked if he learned from Oliver that he had to get *549 current information in order to obtain a search warrant for defendant’s home. He replied: I don’t know how it was said. I was advised that it was a draft and that it wasn’t satisfactory * * * I don’t remember if he had to, whatever papers he brought with him whether he had to conduct any more in depth study. I don’t recall.”
The People concede that Detective Alvarez’ detailed report for February 13, 1973, speaks of a handgun in defendant’s home, but that the report for June 19, 1973, contains nothing whatsoever about seeing or feeling any kind of a handgun in defendant’s apartment on that date. The BOSS supervisor was asked about this latter gap. He replied: "I don’t know if it was never reported. I don’t know.” The report for June 19 contains such detail — of no concern at all to the police — as a meeting at which a health center representative, a youth agency worker and others discussed methods for raising funds for youths in the neighborhood.
Detective Oliver said that just before testifying he discussed with his supervisor and the prosecutor "the problems I had drawing the search warrant up.” But he does not now recall what the problems were, or why the June 26 application was rejected. "Exactly why it was rejected, I don’t know.” He believes that the Criminal Court Judge told him why it was being rejected, but "I don’t recall.”
Oliver was asked if the application was rejected because it contained stale information. He replied: "I don’t think that was it, sir. As I say, I don’t recall that well, but I know he didn’t sign it, and he wanted it done over, he wanted it done over.” He does not recall why the application was "no good.” "I honestly don’t recall * * * if [staleness] was a factor * * * . [The Judge] said it could have been controverted. I don’t recall why * * * . He said he wanted it done over for some purpose. He didn’t want it controverted. Exactly why it was rejected, I don’t know, sir. He just felt that it was a weak affidavit.”
Oliver was asked if any memoranda or paper could refresh his recollection as to why the June 26 application was rejected. "Sir, I’m not an authority on search warrants. I don’t recall. I don’t think there were any minutes taken. I don’t recall * * * Counselor, I don’t recall the specific reason the search warrant was denied on June 26th * * * I don’t recall, sir.”
Oliver was then shown the two applications and asked if an examination of those documents might refresh his recollection *550 of why the June 26 application was rejected. He flippantly replied: "Oh, yes, sir, one thing does refresh my recollection. * * * It’s a lot shorter than this one. I’m not a very good typist.”
On June 27, the day after the first application was rejected, Oliver testified that he telephoned Alvarez at his home. No one told him to telephone Alvarez: "I did it myself.” Oliver testified that Alvarez told him on the telephone that he remembered seeing a handgun in defendant’s home on June 19, some eight days earlier.
Oliver testified that he telephoned Alvarez "to get some current information, because I wanted to make a briefer search warrant * * * I didn’t feel like typing two or three pages if I could do it in one or two. That much I do recall, sir.” (The connection between currency and brevity is less than clear.)
Alvarez conceded that the June 19 incident, which is the sole basis for the search warrant, does not appear in his detailed report for that date, and is strikingly similar to an incident that he reported in November, 1972.
Alvarez’ attention was also directed to that part of Oliver’s June 27 application which reads: "The undercover officer put his hand between the wall and the mattress and did feel a long barreled handgun.” Alvarez rather vigorously denied the truth of this critical statement: "I don’t recall touching * * * I don’t recall touching. I recall seeing * * * I don’t recall touching the gun on that date, no * * * I recall seeing the butt,- the handle of the gun.” Unless Alvarez actually touched the "linen covered” gun, how could Oliver describe it as "a long barreled handgun”? Oliver insisted at the hearing that Alvarez "didn’t see that gun; he said, sir, he just saw the handle and he felt it.” But Alvarez recalls only a "seeing” and not a "touching.”
It is significant that one of the officers who executed the search warrant — Detective Carroll — testified as follows: "we had information from the undercover that one of the guns was secreted under the mattress on the floor * * * He said it was under the mattress, and the mattress was on the floor.” This, of course, seriously clashes with Oliver’s allegation in the June 27 application that the gun was "between the wall and the mattress.”
Alvarez was asked to describe how he told Oliver about the *551 June 19 incident: "I received a call early in the morning, in the morning sometime when I woke up, and Detective Jim Oliver asked me when was the last time I seen contraband or a gun in Collier’s apartment. I told him, I couldn’t off-hand recall, and I went to look at some reports that I might have had with me at the time. I told him I didn’t have anything and off-hand I could not remember, so I thought for a while and then I pinpointed a particular date by people present in Collier’s apartment. At that time Oliver told me that, well he gave the date as June 19, and I explained to him that was the date I seen it, and he asked me where, and I told him where, and he explained to me that he had the reports and he told me he was at the D. A.’s Office trying to fill out a search warrant, and according to the report I did not mention it, so I recall telling him something, well possibly, you know, I left it out, and that was basically it, but that was the date I seen it.”
In relating this conversation, it is significant that Alvarez says that Oliver "told me that, well he gave the date as June 19th, and * * * explained to me that he had the reports.” When Oliver had testified, he was asked if he had gone through the reports before telephoning Alvarez. He replied: "I had read the reports. I won’t say when it was.”
Oliver was also asked where Alvarez said the gun was within the apartment. Oliver replied: "Where the X is marked on the chart.” But this chart was prepared in November, 1972, by Alvarez, and represents a diagram of the defendant’s apartment; and the "X” indicates a spot near the mattress where Alvarez saw a handgun in November, 1972.
When questioned by the District Attorney with respect to some other matter that occurred on June 18, 1973, Alvarez replied: "I would like to review the report * * * The report would help * * * I’d have to refresh my memory with the report. I get dates confused and events.” Given the massive amount of data handled by Alvarez during his undercover work, it is readily understandable how he could confuse dates and events not recorded in his daily detailed reports. In fact, the refrain — "I don’t recall” — appears and reappears throughout the entire transcript of the hearing.
Oliver was asked what Alvarez said over the telephone when told that the June 19 incident was not recorded in any report. Oliver replied: "He didn’t give it a thought.”
In determining a motion to suppress, a court must give the evidence presented at the hearing the thought and careful *552 consideration that it deserves. Initially, a brief comment must be made concerning the execution of the search warrant.
One BOSS officer testified that while executing the search warrant he "proceeded through the apartment, and I observed stuff. It was quite, I guess you’d say unkempt * * * I guess that’s a polite word.” Of course, whether a person’s home contains "stuff” or is tastefully furnished with Chippendale, or whether it is unkempt or tidy, are matters not at all under the Fourth Amendment. William Pitt, the Elder, made this graphically clear in 1763: "The poorest man may in his cottage bid defiance to all the force of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storms may enter, the rain may enter — but the King of England cannot enter; all his forces dare not cross the threshold of the ruined tenement.” And a century before Pitt, Sir Edward Coke wrote: "A man’s house is his castle, et domus sua cuique est tutissimum refugium.” The latter — "one’s home is the safest refuge to everyone” — appears in Justinian’s Pandects (533 a.d.). Thus, the tradition of the privacy of one’s home, however unkempt, is old and established. Politeness alone requires that this tradition be respected and promoted by public servants.
In addition to the firearm and ammunition, the police also took the following items from defendant’s home while executing the search warrant: a mimeograph machine, a projector, a speaker case, and a Rheem victrola.
There was no basis for seizing such items. The letters "BFHS” were stencilled on one of the items. None of the officers seem to recall the item that was initialed with paint: "Whether it was the case for a projector or something else, I don’t recall.” "I believe it was on the speakers, on the — I’m not sure.” "There were two or three pieces there. I don’t recall exactly which ones had it.”
After the above items were removed from defendant’s home, the police officers learned that the initials were those of a high school. The record is clear that even if the underlying warrant were valid, there was no basis to seize this evidence. The officers had no probable cause whatsoever to believe that this was stolen property. (Furthermore, the testimony of the high school custodian before the Grand Jury makes clear that only the Rheems item was legally identifiable. He said that the "approximate value” of this item is $350. Unless this is market value, the legal evidence before the Grand Jury *553 clearly does not support anything other than a misdemeanor charge.)
The return prepared by the officer who executed the warrant indicates inexplicably that a "note book containing addresses” was also seized. This officer testified that he "found” the notebook on defendant’s desk. When asked why he looked through and seized such a personal document as an address book, he explained: "Because at that time Mr. Collier was not in the apartment, and it might have been a source for myself to locate him and arrest him for possession of the gun.” This "explanation” defies credibility. Police officers executing a search warrant in a person’s home should be continually sensitive to constitutional limitations that distinguish our form of government from a police state.
After hearing a suppression motion, a Judge is confronted with the serious responsibility of deciding the issue within the framework of two laudable objectives: first, the maintenance of constitutional protections; and second, the social necessity for police officers to apprehend offenders. "The effect of the Fourth Amendment is to put the courts * * * in the exercise of their power and authority, under limitations and restraints as to the exercise of such power and authority, and to forever secure the people, their persons, houses, papers and effects against all unreasonable searches and seizures under the guise of law. This protection reaches all alike, whether accused of crime or not, and the duty of giving to it force and effect is obligatory upon all intrusted under our Federal system with the enforcement of the laws * * * The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land” (Weeks v United States, 232 US 383, 391-393).
The determination of a suppression motion "depends upon the facts and circumstances — the total atmosphere of the case * * * [Police] officers must justify their conduct before courts which have always been, and must be, jealous of the individual’s right of privacy within the broad sweep of the Fourth Amendment” (United States v Rabinowitz, 339 US 56, 66).
In weighing testimony, the fact-finder is not required to credit a particular fact testified to by one or even six witnesses. The inherent probability or improbability of such a *554 fact is to be tested by the totality of circumstances surrounding the occurrence as well as by the ordinary laws that govern human conduct. Believable testimony must have the ring and flavor of credibility, and the latter "involves more than demeanor. It apprehends the over-all evaluation of testimony in the light of its rationality or internal consistency and the manner in which it hangs together with other evidence” (Carbo v United States, 314 F2d 718, 749).
"In some cases police testimony, like other testimony, will simply be too weak and too incredible, under the circumstances, to accept * * * Sometimes, it is possible to disprove testimony as a matter of logic by the uncontradicted facts or by scientific evidence * * * But the doctrine of inherent incredibility does not require such positive proof. It is enough to invoke the doctrine if the person whose testimony is under scrutiny made allegations which seem highly questionable in the light of common experience and knowledge * * * Our task is a technical one. It has nothing to do with truth in the abstract. The officers’ testimony 'may be true; but we cannot give it effect * * * without disregarding the ordinary laws that govern human conduct’” (Jackson v United States, 353 F2d 862, 867-868).
The People’s evidence presented at the hearing in support of the validity of the search warrant is simply too conflicting, too weak, and too incredible, under the circumstances, to accept. Accordingly, the defendant’s aforesaid motion to suppress the physical evidence seized in this case is granted.
Ill
In contrast to many other Nations in the world, the United States has never authorized the creation of a police agency with unlimited jurisdiction and autonomy. Our society, with its rich tradition of law and limited government, is deeply dedicated to privacy, individual freedom and political tolerance. We cannot live in a free society where we have a sense of being observed by government watchers.
Unwarranted police surveillance will destroy our capacity to tolerate — and even encourage — dissent and nonconformity; it promotes a climate of fear; it intimidates, demoralizes and frightens the community into silence. "Timid men,” Jefferson told us, "prefer the calm of despotism to the boisterous seas of liberty.” A ubiquitous secret police and an obsequious society go hand in hand.
*555 The June, 1975 report of the Rockefeller Commission made this observation: "Individual freedoms and privacy are fundamental in our society. Constitutional government must be maintained. An effective and efficient intelligence system is necessary; and to be effective, many of its activities must be conducted in secrecy. Satisfying these objectives presents considerable opportunity for conflict. The vigorous pursuit of intelligence by certain methods can lead to invasions of individuals’ rights. The preservation of the United States requires an effective intelligence capability, but the preservation of individual liberties within the United States requires limitations or restrictions on gatherings of intelligence. The drawing of reasonable-lines — where legitimate intelligence needs end and erosion of Constitutional government begins — is difficult.”
The requirements of effective law enforcement stand in continual tension with constitutional limitations on the exercise of the police power. But the "Constitution requires the sacrifice of neither security nor liberty.” (Schneckloth v Bustamonte, 412 US 218, 225.) It rests with courts to reconcile the legitimate intelligence needs of law enforcement with constitutional rights. Courts, however, must be resolutely loyal to constitutional safeguards; they must resist the pressures of official expediency. "[T]he history of the criminal law proves that tolerance of short-cut methods in law enforcement impairs its enduring effectiveness.” (Miller v United States, 357 US 301, 313.)
"[W]e must consider the two objects of desire, both of which we cannot have, and make up our minds which to choose. It is desirable that criminals should be detected, and to that end that all available evidence should be used. It also is desirable that the Government should not itself foster and pay for other crimes, when they are the means by which the evidence is to be obtained * * * We have to choose, and for my part, I think it is a less evil that some criminals should escape than that the Government should play an ignoble part.” (Holmes, J., Olmstead v United States, 277 US 438, 470.)
Arbitrary and protracted police surveillance of community groups is the hallmark of every closed society. Important human values are sacrificed when an agency of government in an open society engages in such a course of conduct. A good faith claim by a police agency to control crime in an efficient and effective manner does not justify every infiltration effort. A desirable end can never justify constitutionally impermissi *556 ble means. It is the duty of courts to be watchful for such deviations.
"It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.” (Boyd v United States, 116 US 616, 335.)
The Rockefeller Commission recently disclosed that personnel of one Federal agency infiltrated a law enforcement bureau to deal with allegations of internal corruption. The former head of the latter bureau is reported as saying that he discontinued this infiltration effort "because the philosophy of using this type of covert program seemed to me to be potentially damaging to the morale of agents in the field and also at variance with my philosophy of according the same type of constitutional protection to agents as one accords defendants.” (The New York Times, July 11, 1975.)
In our pluralistic society we abhor spies in our midst. Unrestricted surveillance offends our political and moral sensibilities. Our distaste for spies reflects the natural distaste of a free people. A police agency does not have unlimited power to plant a spy within a community. Such unbridled power clashes with the values of an open society.
You need not be an overheated civil libertarian to fear limitless police surveillance and infiltration. During the Congressional debates in 1798 on the then proposed Alien and Sedition Laws, Representative Edward Livingston made this cogent observation: "The system of espionage being thus established, the country will swarm with informers, spies, delators, and all the odious reptile tribe that breed in the sunshine of despotic power. The hours of the most unsuspected confidence, the intimacies of friendship or the recesses of domestic retirement will afford no security. The companion whom you most trust, the friend in whom you most confide, are tempted to betray your imprudence; to misrepresent your words; to con *557 vey them, distorted by calumny, to the secret tribunal where suspicion is the only evidence that is heard.”
We oft-times think that our values are unique to the American experience. And yet, the issues that confront us today troubled the noted 19th Century English constitutional jurist, Sir Thomas Erskine May: "Next in importance to personal freedom is immunity from suspicions and jealous observations. Men may be without restraints upon their liberty; they may pass to and fro at pleasure; but if their steps are tracked by spies and informers, their words noted down for crimination, their associates watched as conspirators — who shall say that they are free? Nothing is more revolting to Englishmen than the espionage which forms part of the administrative system of continental despotisms. It haunts men like an evil genius, chills their gayety, restraints their wit, casts a shadow over their friendships, and blights their domestic hearth. The freedom of a country may be measured by its immunity from this baleful agency.”
Trust is a very human trait. An undercover operative is charged with winning the trust and confidence of others in order to convey their actions and words to headquarters. Prof. Kent Greenawalt, in his essay, "The Right of Privacy,” notes that a State’s unlimited power to obtain information can be destructive of certain cherished values: "Intimate human relationships depend largely on the sense that the participants are free from the observations of others, and that sense is essential to the development of individual points of view and modes of life. Continuing contacts with those looking for damaging information are both highly unpleasant and disturbing to any sense of security. Moreover, the more wide-sweeping the power to gather evidence, the greater the danger that the power will be arbitrarily used to harass those 'out of favor’ or those against whom particular officials have personal grievances.” (The Rights of Americans [N. Dorsen, ed], p 300.)
In 1952, Judge Learned Hand made this observation: "I believe that community is already in process of dissolution where each man begins to eye his neighbor as a possible enemy * * * where faith in the eventual supremacy of reason has become so timid that we dare not enter our convictions in the open lists to win or lose. Such fears * * * may in the end subject us to despotism as evil as any that we dread.”
The right to lawfully protest, associate and participate must remain inviolate if the members of our community are to *558 influence agencies of government that are or should be concerned with the promotion of social justice. The evidence submitted at the hearing suggests that the defendant is totally involved in efforts to galvanize citizens in his community to become active participants in the decision-making function that affects them in such vital areas as health, housing, social services and employment.
A community must never lack confidence in its ability to influence governmental action. Federal law, for example, requires that certain community action programs be "developed, conducted and administered with the maximum feasible participation of residents of the area and members of the groups served.” Another Federal act requires "widespread citizen participation.” In our city, we have locally elected community school boards and hospital boards.
It is frightening to think that an undercover police officer can, without any guidelines, infiltrate such local community efforts by attending meetings, distributing literature, work for the Board of Elections, visit the homes of participants that he befriended, search the premises, make duplicate keys, etc., and then report in writing to a secret intelligence division all that he has seen, heard and observed each day. The censoring effect of such conduct effectively deters the legitimate exercise of First Amendment rights.
The members of the Lower East Side community, during the two-year period Detective Alvarez posed as a resident with an interest in community affairs, had a constitutionally protected expectation of privacy. This undercover operative was engaged in an open-ended, free-wheeling, people-watching mission unrelated to a proper police function that is consistent with constitutional standards.
The chilling effect of such police conduct upon freedom of speech and association is crystal clear. Many persons may hesitate to attend controversial meetings — in which rhetoric often exceeds intent — if their attendance and comments will be reported and permanently recorded in a police dossier. Since we are not a "dossier society,” such a state of affairs is intolerable. Our government must always foster rather than frustrate free speech.
The then Vice-President of the United States, Hubert H. Humphrey, made this comment in his Foreword to Long, The Intruders: "We act differently if we believe we are being observed. If we can never be sure whether or not we are being *559 watched and listened to, all our actions will be altered and our very character will change.” The in terrorem effect of unwarranted police infiltration of even a limited community group can only chill the exercise by all of us of our constitutional rights. No one’s freedom may be improperly impaired without diminishing the freedom of all.
The objective of the First Amendment is to keep government off the backs of people. The Fourth Amendment protects the "security of one’s privacy against arbitrary intrusion by the police” (Wolf v Colorado, 338 US 25, 27). It stands as a protection of those "values reflecting the concern of our society for the right of each individual to be let alone.” (Tehan v United States ex rel. Shott, 382 US 406, 416.)
"Though physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed, its broader spirit now shields private speech from unreasonable surveillance * * * Fourth Amendment protections become the more necessary when the targets of official surveillance may be those suspected of unorthodoxy in their political beliefs * * * The price of lawful public dissent must not be dread of subjection to an unchecked surveillance power.” (United States v United States Dist. Ct., 407 US 297, 313-314.)
"The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man’s spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone —the most comprehensive of rights and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the Government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment.” (Brandeis, J., in Olmstead v United States, 277 US 438, 478.)
"Crime, even in the privacy of one’s own quarters, is, of course, of grave concérn to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance.” (Johnson v United States, 333 US 10, 14.)
*560 The police violate the First Amendment when they engage in an unrestrained surveillance operation calculated to stifle the willingness of people to exercise those preferred freedoms of speech, association and assembly.
When the police unilaterally decide that there is a need to gather data with respect to a person’s association with others engaged in lawful political, social or community activity, that agency of government should be prepared to show a substantial relationship between the information sought and some compelling government interest. It is difficult to conceive how surveillance and infiltration of persons and associations engaged in lawful political, social and community activity bear any relationship to the important mission of the police to control crime. Such activity can only deter citizens from exercising their First Amendment rights. If we still cherish the Declaration of Independence and the rights we celebrate today, then we must insist that constitutional limits be strictly observed by the police and other public servants. If we take our constitutional guarantees seriously, no court can allow the indictments against defendant to continue to stand.
Public meetings are a prominent feature of our system of freedom of expression. They are the market place of issues and ideas. They must never be indiscriminately infested by government spies. An arbitrary infiltration of a public meeting by an undercover operative constitutes the grossest sort of government interference. The right of associational privacy must never be narrowly construed by a court. No citizen is entitled to only partial protection against unwarranted governmental intrusiveness. The right of protest enjoys a preferred status in our Constitution. Courts must be alert to encourage and protect lawful protests. To permit the prosecution of the defendant in the instant case to continue would discredit the judicial process.
"Governmental misuse of power breeds only apathy, contempt and more lawlessness, a lesson recently and painfully relearned. In the words of Justice Brandéis, written 46 years ago * * •* 'Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the *561 Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means — to declare that the Government may commit crimes in order to secure the conviction of a private criminal — would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face.’” (Matter of Nigrone v Murtagh, 46 AD2d 343, 348, affd 36 NY2d 421.)
Governmental surveillance activity is proliferating to such an extent as to jeopardize the rights of free speech, association and privacy. Limitless police surveillance is inimical to liberty and is as mindless as the shibboleth "punishment without pity.”
Infiltration and clandestine surveillance by undercover operatives necessarily produce a plethora of raw data, that is filed, indexed, cross-referenced, computerized, exchanged, leaked, etc. This hyperactivity in data collection by intelligence agencies poses a clear threat to civil liberties. The Congress and others have issued recent warnings, but the intelligence community continues unabated and largely immune from accountability, coining their efforts with such names as Cointelpro or Operation Chaos.
On February 23, 1971, as a subcommittee of the United States Senate began a series of public hearings on the surveillance issue, Senator Sam J. Ervin, Jr., said: "These hearings were called because it is clear from the complaints being received by Congress that Americans in every walk of life are concerned about the growth of government and private records on individuals. They are concerned about the growing collection of information about them which is none of the business of the collectors * * * [Many people] feel intimidated by the fact that Government takes notes of their activities and maintains this data. They feel that they will never know when it will be used against them to their detriment. They are fearful about exercising their rights under the first amendment * * * When people fear surveillance, whether it exists or not, when they grow afraid to speak their minds and hearts freely to their Government or to anyone else, then we shall cease to be a free society.”
On June 28, 1975, the Murphy Commission submitted a report to the President and stated: "We believe that firmer *562 direction and oversight of the intelligence community are essential.”
At the present time, House and Senate committees are once again conducting extensive probes into the propriety of government investigative and intelligence gathering techniques (The New York Times, July 11, 1975).
Privacy, peace of mind, and freedom of speech and association are particularly precious rights in a free society. It is difficult to conceive of a more patent violation of these cherished rights than the arbitrary planting by a police agency of an undercover detective in a local community who thereafter —for a period of two years — attends lawful meetings under false pretenses and then reports to his superiors "everything that he remembers.” Free wheeling police spies in a neighborhood, without any procedural safeguards, affronts the worth, dignity and self-respect of the members of that community. Such infiltration is particularly repellent in these times when all of us are encouraged to take an active, aggressive interest in community affairs.
There were no hypothetical violations of privacy during the two-year period of a broad and penetrating infiltration of the Lower East Side community. Substantial privacy interests were invaded in an essentially intolerable manner. The deterrent effect on the exercise of First Amendment rights by this secret operation was real and substantial.
Our scheme of government reflects a deep distrust of unchecked police power over essential liberties. And that distrust, I hasten to add, does not depend on any assumption that the police are venal, incompetent or insensitive to civil rights. The right of privacy is "too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. Power is a heady thing; and history shows that the police acting on their own cannot be trusted.” (McDonald v United States, 335 US 451, 455-456.)
Justice Brandéis, a half-century ago, issued this warning: "Experience should teach us to be most on our guard to protect liberty when the Government’s purposes are beneficient. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachments by men of zeal, well-meaning but without understanding.”
On April 27, 1971, in an address entitled, "The Government’s Intelligence Function — A Right or Obligation?” Robert *563 C. Mardian, the then Assistant Attorney General in charge of the Internal Security Division, told the members of the Bar Association for the District of Columbia: "The tragedies of history are repeated when the societies in which tragedies have occurred do not learn the hard lessons they teach. Recent tragic events in the life of our nation * * * point to the role of government in intelligence-gathering as an obligation rather than a right, or privilege.” A month earlier, another Assistant Attorney General defended the Government’s growing domestic intelligence operations, as follows: "Self-discipline on the part of the executive branch will provide an answer to virtually all of the legitimate complaints against excesses of information gathering” (The New York Times, March 12, 1971). Of course, more recent tragic events point to the need for something more effective than executive self-discipline.
"A democratic society, in which respect for the dignity of all men is central, naturally guards against the misuse of the law enforcement process. Zeal in tracking down crime is not in itself an assurance of soberness of judgment. Disinterestedness in law enforcement does not alone prevent disregard of cherished liberties. Experience has therefore counseled that safeguards must be provided against the dangers of the overzealous as well as the despotic. The awful instruments of the criminal law cannot be entrusted to a single functionary. The complicated process of criminal justice is therefore divided into different parts, responsibility for which is separately vested in the various participants upon whom the criminal law relies for its vindication.” (McNabb v United States, 318 US 332, 343.)
The citizens of this nation have an immense passion for privacy. We have chosen not to live in a fishbowl environment. Our form of government contemplates that there ought never to be certain types of surveillance and infiltration of persons and associations. Free citizens in a free society must never fear their government as an all-seeing intruder. Such fear can only promote anomie.
Alvarez reports that defendant was "in deep thought,” that defendant "seemed to have something on his mind,” his speculative interpretation of the meaning of defendant’s "facial expressions,” and his summary conclusion that defendant "seemed to shy away from the real answer” evoke remembrances of the Thought Police in Orwell’s "1984”: "There was *564 of course no way of knowing whether you were being watched at any given moment. How often, or on what system, the Thought Police plugged in on any individual wire was guesswork. It was even conceivable that they watched everybody all the time * * * You had to live — did live, from habit that became instinct — on the assumption that every sound you made was overheard, and, except in darkness, every moment scrutinized.”
The law enforcement establishment exists to prevent criminal conduct and to arrest offenders. Stealth is often a necessary strategy for certain situations. Thus, the deceptive use of undercover operatives to infiltrate a very limited group is permissible when the police believe or suspect that criminal conduct is taking place or may be anticipated. (Lewis v United States, 385 US 206; Hoffa v United States, 385 US 293; Osborn v United States, 385 US 323, 331-332.)
The gathering of evidence against certain offenders is frequently a difficult task. "Thus in drug-related offenses law enforcement personnel have turned to one of the only practicable means of detection: the infiltration of drug rings and a limited participation in their unlawful present practices. Such infiltration is a recognized and permissible means of investigation”. (United States v Russell, 411 US 423, 432.)
The danger from bombings and arsons by depraved cretins posing as "revolutionaries” necessitates firm measures by government. Undercover operatives often perform difficult and dangerous assignments to assure domestic tranquility. While we can never expect a state of perfect order and security, the goal of an open society is to defend itself against the tyranny of the lawless in a manner that comports with constitutional limitations.
An infiltrator may be planted in a group only when the police have articulable reasons to believe or suspect that criminal activity is afoot, and the operation should continue only until sufficient evidence is obtained to warrant an arrest. (See the June, 1975 Rockefeller Commission Report: "Any instrusive investigation of an American citizen by the government must have a sufficient basis to warrant the invasion caused by the particular investigative practices which are utilized * * * The scope of any resulting intrusion on personal privacy must not exceed the degree reasonably believed necessary * * * these conditions must be met * * * to the satisfaction of * * * a court.”)
*565 When an undercover operative represents himself as "game for anything,” this kind of pose tends to generate a dangerous aggressiveness by the operative. And the risk of provocation is always inherent in any infiltration operation. The potential for abuse is enormous. (See Zimroth, op. cit.: "The obvious danger in police methods like these is that the police are sometimes promoting the very activities they say they are trying to prevent. An undercover agent cannot be effective unless he is accepted, and he will not be accepted unless he participates in the activities of the group. But sometimes the fear of being discovered will lead agents or informants to be more vocal and more militant than the people they are investigating” [pp 62-63]. "Undercover operations * * * sometimes bring with them threats to civil liberties — entrapment, provocation, weakening of people’s willingness to join controversial organizations. But the existence of these possibilities does not inexorably lead to a blanket condemnation of undercover agents in all circumstances” [p 91].)
In this case, the infiltration into the community groups that defendant associated with was not the kind of limited infiltration approved by Russell. The police officials who ordered this limitless infiltration failed to perceive the real dangers it posed to the constitutional rights of the residents of the Lower East Side. It is a classic illustration of police power set loose from constitutional limitations. Law enforcement may never be used as an instrument of unfairness. The possibility of unfair "police tactics poses a real and serious threat to civilized notions of justice.” (Schneckloth v Bustamonte, 412 US 218, 225.)
The police do not have carte blanche to do as they wish in the area of undercover infiltration. For example, the police may not plant an operative in a community when no suspected crime is under investigation. The infiltration in this case commenced 18 months before the first putative offense charged against the defendant was incubated.
Police infiltration must be condemned when the exercise of such power is not bounded by precise and clear standards. Infiltration should occur under procedural safeguards designed to obviate the danger of unreasonable impairment of privacy. Insistence for such safeguards is "but a special instance of the larger principle that the freedoms of expression must be ringed about with adequate bulwarks.” (Bantam Books v Sullivan, 372 US 58, 66.)
*566 The sweeping, free-wheeling, penetrating and extremely protracted infiltration of the entire Lower East Side Community that took place in this case presents a very different situation from that in which an undercover police officer courageously infiltrates a conspiracy of international drug dealers or an armed band of hi-jackers. The overzealous law enforcement activity that occurred in this case should not be tolerated by an advanced society.
A motion to dismiss an indictment pursuant to CPL 210.40 is to be determined from the totality of all the circumstances in a particular case. This provision of the CPL is not intended to give a court a "chancellor’s foot” veto over some police or prosecutorial practice that it personally disfavors. The motion cannot be determined by some one infallible touchstone. It is the sort of issue that can only be decided in the concrete factual context of an individual case.
A court must intervene boldly when unfairness or questionable governmental action surfaces in a particular case. The purpose of CPL 210.40 is to interpose the court between the prosecution and the accused in an appropriate case. The judiciary must never passively defer to the executive when the rights of the vulnerable are impermissibly threatened. An independent judiciary must never fear the risk of retribution or the dismay of traditionalists when it makes a decision or issues an opinion that it believes is right.
Police undercover activity must be subject to judicial scrutiny. A challenge — in the form of a CPL 210.40 motion — can be made to an impermissible course of covert conduct that produces evidentiary consequences.
The transcendent value to all persons in our city of the constitutionally protected rights of expression and association warrants the dismissal of the pending indictments because the vast law-abiding members of our communities may well refrain from exercising their rights for fear that a police snooper may be in their midst. The police action against the defendant and others bars the People from invoking the judicial processes to obtain a conviction.
The list of remedial measures available to redress serious constitutional violations includes an order dismissing an accusatory instrument pursuant to CPL 210.40. The indictments in this case must be dismissed because the impermissible investigative techniques require some practical consequences.
*567 "If constitutional rights are to be anything more than pious pronouncements, then some measurable consequence must be attached to their violation. It would be intolerable if the guarantee against unreasonable search and seizure could be violated without practical consequence. It is likewise imperative to have a practical procedure by which courts can review alleged violations of constitutional rights and articulate the meaning of those rights. The advantage of the exclusionary rule — entirely apart from any direct deterrent effect — is that it provides an occasion for judicial review, and it gives credibility to the constitutional guarantees. By demonstrating that society will attach serious consequences to the violation of constitutional rights, the exclusionary rule invokes and magnifies the moral and educative force of the law. Over the long term this may integrate some fourth amendment ideals into the value system or norms of behavior of law enforcement agencies.” (Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U of Chi L Rev 665, 756 [1970].)
The decision in this case is a narrow one: it is not intended to hamper the traditional function of undercover agents infiltrating a limited group whenever the police have some evidence of criminal activity warranting the use of such investigative techniques.
The use of undercover operatives is much discussed at the present time. (See, e.g., Handschu v Special Servs. Div., 349 F Supp 766; Anderson v Sills, 56 NJ 210; Fifth Ave. Peace Parade Committee v Gray, 480 F2d 326, cert den 415 US 948; Yaffe v Powers, 454 F2d 1362; Carlson v Schlesinger, 364 F Supp 626; White v Davis, 13 Cal 3d 757, 767: "As a practical matter, the presence in a university classroom of undercover officers taking notes to be preserved in police dossiers must inevitably inhibit the exercise of free speech both by professors and students.”)
In February, 1973 (as the Lower East Side mission was about to complete its second year of infiltration), the New York City Police Commissioner announced that the names of more than one million people and organizations were purged from the department’s intelligence files. New guidelines for surveillance activity were also announced. (The New York Times, Feb. 9, 1973.)
In April, 1975, the Los Angeles Police Department announced that it had destroyed nearly two million secret files it kept on Los Angeles citizens and organizations, and also *568 announced the adoption of new guidelines for intelligence gathering (The New York Times, April 13, 1975).
On May 27, 1975, the President of the New York City Council and three Councilmen introduced a bill to add a new section to the Administrative Code of the City of New York to provide, inter alia, that "no police officer * * * shall be placed undercover in an organization or citizen group for surreptitious surveillance except upon court order based upon probable cause.” The subject also deserves urgent consideration by the State Legislature. There is a compelling need for legislation to govern covert police activity. Undercover agents should act according to some visible, pre-established rule of law, and not as Alvarez said he did: "I was out there on my own at the time.” A police spy who operates "on his own” and without clearly understood guidelines is probably not going to be concerned with constitutional limitations on the powers of public servants.
The record is clear that BOSS had no probable cause of any kind to initiate the Lower East Side mission or to focus on the defendant — not even the reasonable suspicion found sufficient under Terry v Ohio (392 US 1).
The police power is abused and directed to an impermissible end when employed as it was in this case against defendant. Such methods cannot be countenanced. They are beyond judicial toleration: to approve them would jeopardize the rights of all. The dismissal of the instant indictments constitutes partial reparation for the unwarranted ruptured privacy 0 of the defendant’s person, home, papers and effects.
This prosecution should be stopped, not only because some right of the defendant has been violated, but in order to protect social, political and community groups from being impermissibly penetrated by overzealous law enforcement officers, and to preserve the institutional integrity of our system of criminal justice, i. e., the imperative of judicial integrity. "Courts which sit under our Constitution cannot and will not be made party to lawless invasions of the constitutional rights of citizens by permitting unhindered governmental use of the fruits of such invasions.” (Terry v Ohio, 392 US 1, 13.)
The United States Supreme Court, in United States v Russell (411 US 423, 431-432, supra) recognized that there may be some "conduct of law enforcement agents * * * so outrageous that due process principles would absolutely bar the govern- *569 merit from invoking judicial processes to obtain a conviction.” There is no need to decide whether this is such a case. Suffice it to find that the facts clearly warrant a dismissal pursuant to CPL 210.40.
No purpose would be served in discussing the tenuousness or inconclusiveness of the evidence against the defendant, or why the Grand Jury evidence is legally insufficient with respect to the weapon counts, or how the prosecutor misinstructed the Grand Jury on the law, or why the defendant and not another person was charged with the misdemeanor conspiracy in the first indictment.
In summary, the defendant’s aforesaid motion to suppress the physical evidence seized in this case is granted. The defendant’s aforesaid motion to dismiss the indictments, pursuant to CPL 210.20 (subd 1, par [i]), on the ground specified in CPL 210.40 (subd 1), is also granted.