OPINION OF THE COURT
William D. Friedmann, J.
Defendant Eric Vecchio’s motion places in perspective whether his satisfactory "second chance” experience, as a full-time participant in a residential drug rehabilitation program, designed to return addicts (ex) or substance abusers to society, constitutes such a "compelling factor, consideration or circumstance”, under CPL 210.20 and 210.40, as to warrant dismissal of the two top counts of the indictment (criminal sale of a controlled substance, second degree [Penal Law § 220.41, A-II *166 felony]; criminal possession of a controlled substance, third degree [Penal Law § 220.16, B felony]), which counts require mandatory mínimums of incarceration upon conviction.
RELEVANT FACTS
The People contend that the moving defendant, a 17 year old with no prior criminal record, assisted a codefendant (Michael Ortiz) in the sale of seven eighths of an ounce of cocaine to an undercover police purchaser. Defendant was then a drug user with a dependency problem.
THE PRESENTENCE EVALUATION
A presentence evaluation of this defendant by the Department of Probation indicates in part that he is "presently a resident of an upstate drug program * * * apparently raised by interested and caring parents * * * began abusing drugs at approximately the age of 13 * * * apparently unable to come to terms with his abuse problems until his instant arrest * * * voluntarily committed himself to the Renaissance Project on January 8, 1987 * * * he no longer denies that he has a problem and is apparently taking some action to deal with his drug abuse problem”.
PLEA NEGOTIATIONS
Faced with the spectre of a mandatory minimum sentence of three years to life for the top count of the indictment (criminal sale of a controlled substance, second degree — AJI felony) with no leeway for the consideration of mitigating factors, which did not fit the characteristics of the crime involved or the defendant Eric Vecchio, this court, defense counsel and the District Attorney’s office have conducted plea discussions over the past eight months. During this time, the defendant has been a full-time participant in a residential drug program — "The Renaissance Project” — supported by the New York State Division of Substance Abuse Services. These conferences sought to arrive at an agreement which would circumvent the harsh mandatory minimum sentence of three years to life. The District Attorney’s office initially offered to dismiss the top A-II felony count upon the defendant being willing to plead guilty to a B felony, which required an indeterminate jail sentence of 1 to 3 years. Defense counsel and this court urged the appropriateness of a probationary sentence conditioned upon the defendant’s successful comple *167 tion of the two-year in-patient residential program with concurrent and supervisory follow-up by the Department of Probation. Subsequently, the District Attorney’s office tentatively agreed with this desired probationary disposition, conditioned, however, upon the acceptance by the codefendant (Michael Ortiz) of a plea of guilty and the court’s imposition of a significant term of incarceration. It is to be noted that defendant Vecchio has no control over any disposition of charges relating to his codefendant.
COMPETING SOCIAL VALUES
Any society’s legal system has the ultimate responsibility of providing a code of activity for human interaction. Hopefully, the social values current in a particular democratic society will be reflected in its law through the involvement of societal representatives such as legislators, Judges and others.
Sometimes a society’s value trends appear to be in sharp collision, one with another. Such a confrontation can occur when a criminal court is required to implement mandatory sentencing schemes devised by a Legislature in response to the concerns and passions of the day.
Traditionally, under our system of justice, a sentencing court, following any guilty plea or conviction, has a substantial degree of latitude in determining the severity or leniency of a sentence. This discretionary latitude, however, under a mandatory sentencing scheme, limited or gravely restricted by legislation which imposes nonflexible mínimums, as to a particular offense, does not enable a sentencing court to find "mitigating circumstances” based upon the characteristics of the crime and/or the criminal. This result, therefore, runs contrary to most concepts of judicial fair play, which rests upon the premise that the punishment for any offense should fit the nature of the crime and the individual criminal perpetrator involved.
The effect of the 1973 Rockefeller drug laws was largely directed at divesting the judiciary of discretion in the disposition of indictments and imposition of mandatory sentences in drug offenses (Signorelli, A Judicial Analysis and Critique of the New Drug and Sentence Laws, 46 NY St Bar J 9 [1974]; 60 Cornell L Rev 638, 639).
Despite widespread criticism, these mandatory drug sentencing laws have repeatedly been held constitutional (People v Broadie, 37 NY2d 100, cert denied 423 US 950; People v *168 Arroyave, 63 AD2d 127; People v Jones, 39 NY2d 694; People v Barton, 51 AD2d 1044; People v Johnson, 53 AD2d 777; People v Merriman, 53 AD2d 633).
It has been recognized that these mandatory sentence provisions deprive Judges and correctional authorities of the ability to base their judgments on the seriousness of the violations and the particular characteristics and potential for rehabilitation of the offender (President’s Commn On Law Enforcement And Administration Of Justice, The Challenge Of Crime In A Free Society, Task Force Report, Narcotics and Drug Abuse, at 11 [1967]).
Various courts both at the trial and appeals levels have echoed concern over the rigid approach concerning sentencing. Judge Ernest Signorelli of the Suffolk County Court likens the law to a straitjacket (Signorelli, op. cit, at 18).
The Appellate Division, Second Department, in People v Castillo (61 AD2d 1034) has expressed the need for legislative reform with respect to mandatory sentences. The Appellate Division went so far as to indicate they would modify the sentence there in the interest of justice.
As a safeguard against this proscription for restriction of sentencing discretion and acting as a safety valve or net is a court’s overriding discretionary power to prevent injustice by dismissing in a particular case an indictment or parts thereof "in furtherance of justice”, when one or more compelling factors, considerations or circumstances are present (codified in CPL 210.20 [1] [i]; 210.40 [1]). (People v Mitchell, 99 AD2d 609; People v Kidd, 76 AD2d 665; People v Ramos, 33 AD2d 344; People v Weaver, 112 AD2d 782.)
DISMISSAL IN THE INTEREST OF JUSTICE
As aforesaid, CPL 210.20 (1) and 210.40 (1) permit a court to dismiss an indictment where, in the opinion of the court, there exists "some compelling factor, consideration or circumstance clearly demonstrating that conviction or prosecution * * * would constitute * * * injustice”. Dismissal of an indictment in the furtherance of justice is discretionary with the court and must rest upon a "sensitive balancing” of the interests of the individual and the State (People v Kwok Ming Chan, 45 AD2d 613 [1st Dept 1974]; People v Clayton, 41 AD2d 204, 208 [2d Dept 1973]).
The Court of Appeals observed in People v Tyler (46 NY2d 264, 266-267 [1978]) that "[a] motion for dismissal under CPL *169 210.40 is not made in a vacuum, isolated from all else; rather, a ruling thereon is based upon the 'totality of all the circumstances in [the] particular case’ ” (see, People v Collier, 85 Misc 2d 529, 566 [Sup Ct, NY County, McQuillan, J., 1975]).
Even though CPL 210.40 (1) sets forth 10 separate criteria or determinants for consideration and CPL 210.40 (2) indicates that the court’s dismissal reasoning must be set upon the court record, there is no requirement that all statutory criteria or determinants need not be covered in each and every instance. The Court of Appeals has stated that it is not mandatory that "each of the decalogue of possible determinants which make up paragraphs (a) through (j) of [CPL 210.40 (1)] be spelled out in so many words”, so long as "the ultimate reasons given for the dismissal are both real and compelling” (People v Rickert, 58 NY2d 122, 128 [1983]).
The Legislature in codifying previous common-law dismissal concepts and precedents into CPL 210.40 did not carve out any exceptions to its applicability, i.e., such as, in the case where a legislatively mandated sentencing scheme would be effected, etc. The Legislature did not create any exclusive restrictions when it adopted mandatory sentencing provisions with respect to a specific drug-related crime as involved herein.
THE SENTENCING OBJECTIVE OF NONINCARCERATION REHABILITATION AS A COMPELLING FACTOR UNDER CPL 210.40 (1)
Generally speaking, nearly every sentence passed on a criminal offender is directed towards achieving 1 or more of 4 basic ends (deterrence, separation, rehabilitation and retribution).
These sentencing purposes are intended to subject the offender to some form of suffering or penalty, depriving him of life or liberty (permanently or temporarily) through death or incarceration.
The major underlying theory behind these sentencing ends is that the fear of possible death, incarceratory punishment or suffering, will operate in some way in the minds of potential lawbreakers to deter them from committing future criminal acts. Thus, resulting in a determinant effect on offender recidivism. (Burns, Philosophy of Sentencing, US Dist Ct, Portland, Ore; The National Judicial College, "Sentencing”, ABA at Univ of Nevada, ch 1, at 1-5 [Sept. 1978].)
Although considerable modern penological opinion recog *170 nizes that whatever sentencing form is undertaken as a deterrent to crime, the various forms used have largely failed in their objectives. Nevertheless, punishment, etc., can be expected to be society’s main answer to the criminal offender until some more satisfactory substitute is found. (Flick, 4 Baalman’s Outline of Law in Australia, Sentence and Punishment, at 237 [Law Book Co. Ltd., 1979]; see, VandenHaag, Does Punishment Deter? Statistical and Experimental Evidence, ch 13, Punishing Criminals: Concerning a Very Old and Painful Question [Basic Books, Inc., 1975].)
For the past 70-odd years sentencing policies; as expressed in United States correctional opinion, have been dominated by a commitment to incarceration-rehabilitation through the imposition of indeterminant sentences. Judges have been called upon to pronounce a sentence in very general terms by specifying a minimum and maximum sentence. The final decision thereby resting largely with a Parole Board. Recent evaluation of this "rehabilitation leading to release” experience has indicated that they have had a very questionable effect on offender recidivism (see, Lipton, Martinson and Wilks, The Effectiveness of Correctional Treatment: A Survey of Treatment Evaluation Studies [NY, Praeger 1975]; Sechrest, White and Brown, The Rehabilitation of Criminal Offenders: Problems and Prospects, Report of NAS Panel on Research on Rehabilitative Techniques [Washington, D.C., National Academy Press 1979]; 68 Judicature Magazine, Criminal Sentencing In Transition, Oct.-Nov. 1984, Nos. 4-5).
Further, during this period of rehabilitation commitment, there has been a movement within penal institutions towards vocational and other training of those incarcerated as a step towards their eventual rehabilitation. Unfortunately, these efforts have been largely ineffective because of restricted prison budgetary provisions and other inhibiting factors. For example, a 1985 study report, issued by the Committee on Corrections of the Association of the Bar of the City of New York, made the following recommendations, some of which it was indicated were in the process of being implemented by the Department of Correctional Services of the State of New York, the agency administering New York State prisons:
-Develop prison education and skills programs that will be marketable for inmates in mainstream society.
-Establish factories and shops that will develop and/or tap "real work” skills and produce goods that are competitive with products sold in the open market.
*171 -Repeal "state use” statutes that limit the sale of prison-made goods to State governmental agencies and discourage private industry from setting up industrial programs within prison walls. (The Record, Can Our Prisons Become Factories With Fences, May 1985; and relevant Comment, NYLJ, May 17, 1985, at 1, col 3.)
No one with half an open eye can fail to appreciate the tremendous impact of alcohol and substance abuse on the criminal justice system. (Robert V. Sheer, Cochairman, Director of New York State Division of Alcoholism and Alcohol Abuse, reported that about half of all crime in the State of New York was alcohol related and that only about 8% of the estimated 1.4 million New Yorkers with a drinking problem are being treated [NY Daily News, Nov. 19, 1984, at 26].) James K. Stewart, Director of the National Institute of Justice, a Division of the United States Department of Justice, reported that a study of arrests in New York City in mid-1984 showed that more than half of the accused criminals exhibited evidence of drug use — usually cocaine at the time of their arrest (NY Newsday, June 4, 1986, at 2). Eric Wish of the National Institute of Justice based upon a follow-up study reported that a survey of people arrested for serious crimes in the Borough of Manhattan of the City of New York in 1986 indicated that 8 out of 10 had traces of cocaine in their systems — almost twice the number detected in a 1984 study. The strongest increase in cocaine use was registered among people aged 16 to 20 (NY Post, Feb. 19, 1987, at 21).
Recognizing that the following seems to be the unfortunate facts of modern day criminal justice experience
(1) deterrents and incarceration-based rehabilitation sentencing approaches of a determinant and/or indeterminant nature seem to have largely failed, in their objectives of keeping persons from committing future criminal acts (current crime statistics and overcrowded State prisons and local jails attest to this);
(2) the significant number of alcohol and substance abusers who are committing crimes has caused considerable interest in various rehabilitation approaches through alternatives to incarceration.
This interest has been especially pertinent with respect to those charged with the commission of nonviolent offenses such as is illustrated by most drug-related crimes. (See, 1986 Criminal Justice Counteragenda, The Campaign For Common Sense *172 In Criminal Justice; Task Force Report to Gov Mario M. Cuomo, Governor’s Task Force On Alcoholism Treatment In Criminal Justice ch IV [Oct. 1986]; NY State Div of Correctional Servs, The Intensive Supervision — Alternative Sentencing Program — A Program Description [May 1985]); Harland, Court-Ordered Community Service in Criminal Law: the Continuing Tyranny of Benevolence?, 29 Buffalo L Rev 425 [1980]; Harris, Excerpts from Community Service by Offenders, US Dept of Justice, Natl Institute of Corrections [1979]; Baird, Report on Intensive Supervision Programs in Probation and Parole [1983]; Goldberg, Intensive Supervision Program Alternative Sentencing Program, NY State Div of Probation [1983]; Baer, The Alternative Sentence and Multi-Faceted Programs, NYLJ, Mar. 1, 1984, at 1, col 3.)
It is interesting to note that the Queens County District Attorney’s office has had for the past number of years a "Second Chance” program. However, this program unfortunately has been expressly restricted to those youthful offenders committing nonviolent misdemeanors with no drug involvement (Santucci, Second Chance Program [pamph], at 19-20 [1983]).
Although a reliable statistical bank has not as yet been gathered, it would appear that these nonincarceration "second chance” efforts offer great promise in reducing offender recidivism.
This court is inclined to believe that the criminal justice system must make a concerted effort to salvage, by resort to non-incarceration-rehabilitation programs, wherever possible and merited, those who have become sidetracked from the mainstream of our society through alcohol- and drug-related substance abuse, especially those who are young, first-time offenders.
It would seem to make sense that regardless of the motivation of an offender to enter a substance abuse program that his or her entrance as soon after arrest as is possible has great merit and should be encouraged. Early admission into a second chance program enables a future sentencing court, the District Attorney’s office and others to consider a rehabilitative track record prior to any prepleading evaluation or pretrial discussion. Just as important, early entrance would seem beneficial to the drug-dependent offender.
APPLICATION OF CPL 210.40 (1) HEREIN
Without in any way seeking to minimize the seriousness of *173 participating even in a limited way, in a sale of cocaine (seven eighths of an ounce), this court finds that the circumstances of this particular case are such that the paragraph criteria of CPL 210.40 (1) at
"(d) the history, character and condition of the defendant; * * *
"(f) the purpose and effect of imposing upon the defendant a sentence authorized for the offense;
"(g) the impact of a dismissal upon the confidence of the public in the criminal justice system; [and]
"(h) the impact of a dismissal on the safety or welfare of the community”,
are satisfied by the dismissal of the top two counts of this indictment.
This 17-year-old former drug abuser has no prior arrest record. As a result of the "in-court” and written monthly updates over the past 10 months, this court is satisfied that the defendant, as a full-time resident of "The Renaissance Project”, is making a successful adjustment toward a drug-free life. The program reports that the progress towards modifying his behavior and heightening his self-control has been encouraging. The defendant completed his GED course and received his diploma.
Accordingly, this court finds that under the circumstances the dismissal of the two top counts would enable this court to avoid an unjust, unreasonable and negatively productive mandatory sentence of incarceration. Such dismissals would enable defendant to plead guilty to the balance of the indictment and this court to sentence him to a probationary sentence. Such probationary sentence would- be subject to defendant’s satisfactory completion of the two-year residential program that the defendant has been in since January 8, 1987 and would be followed by three years’ additional probationary supervision. The entire probationary sentence would further be subject to a maximum of 5 to 15 years’ contingency incarceration commitment in the event the program was not satisfactorily completed or that there was a rearrest or other behavior which would constitute a violation of probation.
Upon a balancing of all interests such a sentence would leave the defendant with a felony record (criminal possession of a controlled substance, fourth degree [a C felony]), and place him in a position to complete, under the supervision of *174 the Department of Probation, his two-year in-patient commitment at "The Renaissance Project”.
The successful rehabilitation of this defendant would seem to be an obvious benefit to the defendant and all concerned. On the other hand, the aborting of defendant’s treatment process at "The Renaissance Project” at this time and his incarceration for from 1 to 3 years would seem senseless and accomplish absolutely nothing. In fact, it is almost certainly predictable that such incarceration would have a negative effect upon all concerned.
This case and others, where the "second chance” rehabilitation of the defendant seems predictable, represents what former Court of Appeals Judge Fuchsberg, in a concurring opinion (People v Beige, 41 NY2d 60, 62-63 [1976]), called "the unusual case that cries out for futidamental justice beyond the confines of conventional considerations of 'legal or factual merits of the charge or even on the guilt or innocence of the defendant’ ”.
ALTERNATIVE RELIEF
Transfer To Special Narcotics Part
Pursuant To Article 5-B of the Judiciary Law
Defendant seeks alternative relief transferring-this matter from Queens County Supreme Court to the Special Narcotics Part (sitting in NY County), pursuant to the intent of article 5-B of the Judiciary Law.
Although no authority has been cited in support of such transfer or seems to presently exist, this court determines after analysis of sections 177-a and 177-b of article 5-B of the Judiciary Law that it is empowered to transfer a pending narcotic indictment to any Special Narcotics Part in the City of New York. Such seems to be clearly contemplated by subdivision (2) of section 177-b where it is stated in total "2. Notwithstanding any other provision of law, upon or after arraignment on a narcotics indictment filed in the supreme court in any county within such cities and before entry of a plea of guilty or commencement of trial, such supreme court may order that the indictment and action be assigned to a special narcotics part of the supreme court.” Inasmuch as this motion is being resolved on other grounds, there is no neces *175 sity to implement the proposed transfer. However, this court notes that such action, if taken, would have been reluctantly taken and only as a very last resort to insure that the interests of justice were served in the context of the characteristics of the crime and the offender.