THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v STEVEN BROOKS, Defendant.

Supreme Court, Kings County, December 21, 1988

## APPEARANCES OF COUNSEL

*Elizabeth Sack Felber* for defendant. *Elizabeth Holtzman, District Attorney (David Potter* of counsel), for plaintiff.

## OPINION OF THE COURT

HAROLD FERTIG, J.

The defendant seeks an order dismissing the indictment in its entirety on the two felony counts therein, in the interest of justice, pursuant to CPL 210.40.

The attendant circumstances in this case has led this court to conclude that the Legislature has been remiss in trying to eliminate offender recidivism in one particular group within the prison population. There are a number of defendants who come before the court evincing a need for treatment and should not be let out on the street outside the court's jurisdiction nor left in jail. In some cases, jail, rather than being a deterrent, simply removes a defendant temporarily from society and, upon release, he is back on the street equally as ill

equipped to cope with society as he was prior to the commission of the crime that landed him in prison. The legislative inaction in failing to provide the courts with an alternative to either sending such a defendant back onto the street or to prison for a term of incarceration ignores not just this type of defendant but society as a whole. Within the penal institutions very little provision is made to help such an inmate learn to cope when he returns to the community.

The primary function of our correctional system is confinement. To address the needs of this particular group there should be a correctional facility whose primary function is to provide psychological and social skill services. This large number of inmates needs help in improving their mental attitude so as to become productive in society. Instead they are only helped in coping with living in the prison population. The Legislature apparently has acted upon a short-term economic evaluation rather than the broader range in its determination to provide little more than "temporary housing" for such criminals. Providing treatment for this category of inmates while imprisoned stands to make for a successful reintegration into society upon the individual's release. The cost to society might well be far less in the long run if legislation were enacted for the creation and implementation of productive treatment programs geared at "correcting" attitudes and behavior of these inmates and preparing them to meet societal challenges rather than merely learning to cope with prison life.

Steven Brooks epitomizes the situation in which the court's hands are tied by the Legislature. Because Steven is a persistent felony offender, if convinced, he faces a mandatory jail sentence. He cannot plead guilty to a misdemeanor in satisfaction of the indictment as the District Attorney's office will not reduce the charges, therefore, the court is powerless to sentence him to supervision outside of prison, via probation. Five psychiatrists have found Steven fit to proceed. He is not "crazy" enough to be put into a psychiatric hospital by commitment. He is not "incompetent" enough for the Department of Mental Hygiene to take custody of him. This leaves the court faced with only 1 of 2 options: either release Steven Brooks in the interest of justice, pursuant to CPL 210.40, or incarcerate him if he is convicted.

FINDINGS OF FACT

On December 9, 1986, the defendant, Steven Brooks, then a

28-year-old male with a lifelong history of mental, physical and psychological disabilities, was arrested and charged with burglary in the third degree, criminal mischief in the third degree, petit larceny and criminal possession of stolen property in the fifth degree. It is alleged that on December 9, 1986, at approximately 9:55 P.M., he broke a window to a beer distributor outlet and was observed taking a case of beer and a television. Defendant appeared to be intoxicated but able to respond to police officers.

To assist this court in a determination of this motion, a hearing under *People v Clayton* (41 AD2d 204 [2d Dept 1973]) was held. At this hearing, Dr. Richard Weidenbacher, forensic psychiatrist, Dr. Richard M. Pankiewicz, psychiatrist, and Carmine Correale, a certified social worker, Special Defendant Services of the Legal Aid Society, testified for Mr. Brooks, and Dr. Paul Kleinman, psychologist, Downstate Correctional Facility, testified for the People.

Dr. Weidenbacher originally examined the defendant, Steven Brooks, on the order of the court for the purpose of a CPL 730.30 examination. He found the defendant fit to proceed to trial. At the *Clayton* hearing, Dr. Weidenbacher testified that the defendant was not psychotic or schizophrenic but that he was an alienated individual, not by choice, isolated from others and chronically depressed. He cited defendant's physical and mental disabilities as well as his personal history as factors which contributed to the defendant's situation. He characterized defendant as being "borderline" mentally retarded, as someone with very limited intelligence. He said that defendant suffered from a mixed brain disorder as the result of being hit by a car when he was a young child. This disorder also resulted in defendant having a hearing impairment.

Dr. Weidenbacher further testified that the defendant has no family and, therefore, no support system. Defendant was abandoned by his mother at an early age and lived with his grandmother until she died in 1986. In his professional opinion he believed that the defendant had experienced rejection, both from his family and from his peers, all his life and that he was not a violent person. The crimes Steven Brooks have committed are nuisance crimes and not crimes involving victims. In summary, Dr. Weidenbacher did not think that the defendant, in his pattern of criminal behavior, preyed upon other people. He did not view defendant as a dangerous person. He stated that the defendant had in the past abused

drugs and more recently had turned to alcohol as a result of being chronically depressed. He further testified that the defendant needed to be placed in a residential treatment program with counseling, a support system and vocational training as he has never learned to cope with and integrate into society.

Dr. Pankiewicz works for the Montefiore Medical Services staff in Rikers Island. He testified that he has seen Steven since January 1988 on an average of once every two weeks, ordering medication, evaluating him and doing some psychotherapy, all in the span of 20 to 25 minutes maximum per visit. He said that Steven has no plans for his future, no skills, no means of support; he looks at life as a day-by-day existence with no direction. He concurred with Dr. Weidenbacher's evaluation of Steven and believes that if Steven were to remain incarcerated it would just perpetuate his sense of frustration and alienation with the system and society in general. He thinks that the defendant needs a residential program where people will be there not only to watch Steven, but also to "sort of start him over again".

Dr. Pankiewicz is in his eleventh year working at Rikers Island. Based on this fact he stated that because of the overload of inmates in need of psychiatric, psychological, emotional and socialization assistance, the best that can be given to the inmates is help in coping with their present prison situation. The inmates are not prepped for the world outside of prison.

Mr. Carmine Correale testified regarding his evaluation of the defendant, derived from three interviews conducted since March 21, 1988. He stated that Steven's personality is that of a person who has been institutionalized; all he really knows are institutions. He thinks that defendant is very naive and limited in his ability to interact with the "typical, incarcerated person" thereby making it extremely difficult for him in dealing with the "jail environment".

Mr. Correale's job is to make referrals. He has explored several residential programs for placement of Steven. In his opinion it is in this type setting that Steven belongs. He stated that mental health people in institutions are overburdened with large numbers of inmates, and treatment is not as intense or as often or as consistent.

In an attempt to refute the findings of defendant's experts who stressed a compelling need for Steven Brooks to not be

incarcerated but, rather, placed in a residential treatment facility, Dr. Paul Kleinman testified on behalf of the People. He explained that all inmates coming from New York City and all the way north to Canada on the east coast of New York come through Downstate Correctional Facility. There they are processed, tested and evaluated. The first thing the correctional counselors do is review probation reports and custodial reports to try to identify problem cases, such as suicidal tendencies in the county or city jails, protective custody prisoners, etc. The custodial reports come from the county or city jails where the respective inmates were recently incarcerated. The reports indicate the adjustment of the inmates at those jails.

The Department of Correctional Services screeners look for inmates with mental health problems, mental retardation, some disabling factor which might prevent an inmate from "adequately" adjusting in the general prison population. If one of these problems exists, the inmate is referred to Dr. Kleinman who will interview the inmate and determine whether that inmate can remain in the general prison population or have to go to a "Special Needs Unit". The "special needs" might be physical, general medical, psychological or educational.

Dr. Kleinman testified that every person who comes through Downstate is given a test of basic adult education: mathematics, reading and Beta (I.Q. test—nonverbal). A "package" of various testing is put together and upon evaluation of the results, the needs of the inmate are known, and he, the inmate, is informed of the services available to him. He stated that no one is forced to participate. It is merely suggested that their needs get priority, such as drug therapy, mental health, inpatient, outpatient, weekly, biweekly or monthly. Dr. Kleinman made a "vague guess" that, at the minimum, 50% of all the inmates are in need of some mental help. He estimated that there are 11,000 inmates in the custody of the New York State Department of Correctional Services.

He further testified describing some of the correctional facilities in New York State and the separate, special needs each seeks to address. The Merle Cooper Special Program at Clinton Annex Correctional Facility, as described, appears to be the one facility which might address the needs of Steven Brooks. At this facility, Dr. Kleinman stated, the immediate goal is to have the inmate function adequately in the general

prison population and, once accomplished, then give him the tools, the understanding to be a productive citizen in his community. There are 150 beds at this facility.

If the court is to use Dr. Kleinman's figures, out of the 11,000 inmates, 5,500, at a minimum, suffer some mental problem. Out of these 5,500, 150 inmates are funneled through to the Merle Cooper program. The odds of Steven Brooks or the many others within the system who are just like Steven Brooks, getting into one of the 150 beds, are very slim.

From the testimony in this hearing, the burning question arises: what is the function of our correctional system as intended by the Legislature which created it and perpetuates it? There exists a group of individuals in our population who will continually commit crime, go to prison, serve a term of imprisonment and upon release, repeat the cycle. This is the only way of life these people know.

Is society meeting its challenge of providing for the general welfare of its individual citizens? Within the group of people who spin through the revolving door of the criminal justice system is a large number of individuals whose criminal activity stems from psychological problems and/or the fact that they never were integrated into society, be it from lack of familial support and structure or a psychological imbalance which was never treated properly, never balanced out.

The court is ever cognizant of the number of people who commit crime and the economic limitations placed upon the New York State Department of Correctional Services to deal with the volume. It is true that it is incumbent upon the individual to choose the life he will live, within the parameters of his abilities. The State obviously cannot force a person to do one thing or another with his life. If it could, then we would not have "law" breakers and an excessive prison population. Within its means, the Department of Correctional Services provides various programs for those inmates who care to avail themselves to their individual advantage with the prospect of enabling them to break the "cycle" upon return to society.

The people who fall through the "cracks" of society and the general prison population are the Steven Brookses of this world. No one ever gave him the time, attention and proper assistance he needed to even formulate the notion to seek and avail himself of help, inside or outside of prison. Steven has been incarcerated in the past. He travels through the "revolving door".

CONCLUSIONS OF LAW

The New York Court of Appeals has stated that it is not mandatory that "each of the decalogue of possible determinants which make up paragraphs (a) through (j) of [CPL 210.40 (1)] be spelled out in so many words", so long as "the ultimate reasons given for the dismissal are both real and compelling" *(People v Rickert,* 58 NY2d 122, 128 [1983]). The Appellate Division, Second Department, has emphasized that the compelling factor which exists must *clearly* demonstrate that conviction or prosecution upon the indictment would constitute an injustice *(People v Finley,* 104 AD2d 450). In deciding such a motion there must be a sensitive balancing of the interests of the individual and the interests of the State *(People v Clayton,* 41 AD2d 204, 207-208; *People v Kwok Ming Chan,* 45 AD2d 613; *People v Belkota,* 50 AD2d 118, 120). Hereinbelow, the court states its balancing effort.

A motion to dismiss an indictment or any count thereof may be granted in furtherance of justice when, even though there may be no basis for dismissal as a matter of law, such dismissal is required as a matter of judicial discretion by the existence of some compelling factor, consideration or circumstance clearly demonstrating that conviction or prosecution of the defendant upon such indictment would constitute an injustice pursuant to CPL 210.40. The court has examined and considered, individually and collectively, the 10 criteria set forth in the statute and makes the following comments:

*"(a) the seriousness and circumstances of the offense;*
*(b) the extent of harm caused by the offense" (CPL 210.40*
*[1] [a], [b])*

The most serious charge in the indictment is burglary in the third degree. Defendant is charged with taking beer and a television set from a beer distributorship. The property in question was of limited monetary value. No one was injured or harmed in any way and there are no allegations that the defendant possessed any weapon or resisted arrest.

*"(c) the evidence of guilt, whether admissible*
*or inadmissible at trial" (CPL 210.40 [1] [c])*

Given the defendant's disabilities: his brain damage and limited intelligence, the People may have difficulty proving that the defendant possessed the requisite criminal intent to

commit the crimes with which he is charged, more specifically, the burglary charge. It is a fact that the defendant was caught "red-handed".

### "(d) the history, character and condition of the defendant" (CPL 210.40 [1] [d])

This has been explicitly set forth at great length hereinbefore. The court notes that it is aware that mental illness alone does not constitute a compelling factor *(People v Lasdon,* 89 Misc 2d 934). The testimony herein indicates that it is but one of Steven Brooks' problems.

### "(f) the purpose and effect of imposing [sentence] upon the defendant" (CPL 210.40 [1] [f])

These criteria, as well as CPL 210.40 (1) (d), defendant's history, etc., are truly the factors which compel a dismissal of the two felony counts of the indictment. The defendant has been incarcerated on this case since January 6, 1988. According to Dr. Weidenbacher, further incarceration will not rehabilitate the defendant. The common-law version of CPL 210.40 as elaborated in *People v Clayton (supra)* takes the punishment already suffered by the defendant into consideration, as does this court herein.

Generally, every sentence passed on a criminal offender is directed towards achieving 1 or more of 4 basic ends: deterrence, separation, rehabilitation and retribution. The major underlying theory behind these sentencing ends is that the fear of possible death, incarceratory punishment or suffering will operate in some way in the minds of the lawbreakers to deter them from committing future criminal acts, thus, resulting in a determinant effect on offender recidivism (Burns, Philosophy of Sentencing [US Dist Ct, Portland, Ore]; National Judicial College, *"Sentencing",* ABA at Univ of Nev, ch 1, at 1-5 [Sept. 1978], as cited in *People v Vecchio,* 139 Misc 2d 165, 169).

Considering, individually and collectively, the "four basic ends" to sentencing, defendant, if convicted of the burglary charge, would face a minimum jail term of 2 to 4 years. This is not the type of crime which would necessitate the imposition of a greater than the minimum sentence. The defendant has served just short of one year to date. The retribution end, which the District Attorney at the hearing sought to urge upon the court as necessary for this defendant, has been

attained due to the length of his time served pending the resolution of this motion.

The court in dismissing the two felony counts leaves standing two class A misdemeanor charges. Should the defendant be convicted of these remaining counts after trial or plea, the court would then be able to impose a sentence of three years' probation with a condition that the defendant be supervised in the structured environment of a residential treatment program. This court feels such a result would be in the best interest of defendant and of society. It is hoped that defendant may be rehabilitated. Defense counsel has been the person to finally give Steven Brooks the needed attention. She has urged the same of this court. Steven has been involved in the Seventh Day Adventist Charities Program in the past and yet again committed crime. However, it has been brought to the court's attention that they have implemented a "new level" due to additional funding. There is now more intensive supervision, a counselor available 24 hours a day, attention to grooming, room cleaning, skills, the everyday basics and an intensive supportive unit as the individual progresses, whereby, outside the facility, apartments are provided to be shared with another participant. The supervisor visits twice a day, less often as the weeks pass and progress evinces. Defendant's application process is in the works.

Whether defendant is accepted to this program or not, if conditional probation is imposed, "a" program will be arranged for defendant outside prison by the Department of Probation. The only justice which can be served herein is that defendant be afforded a fighting chance, with proper assistance, to be able to cope with society. The needed assistance is not provided by the Department of Correctional Services as it presently deals with inmates. In *People v Wright* (NYLJ, Feb. 5, 1988, at 14, col 2), it was admitted that just five months prior to the *Clayton* hearing therein, a court-ordered settlement was imposed upon the Bedford Hills Correctional Facility to correct the diagnosis of inmates with emotional disorders as disciplinary problems and their being sent to solitary confinement. Surely, Steven Brooks with his multitude of problems has a chance to break his "cycle" by his placement in a residential treatment facility.

This instant case is distinguishable from *People v Stringer* (NYLJ, Nov. 20, 1987, at 19, col 5), wherein the defendant, with a mental illness, was denied dismissal in the interest of justice because the court did not want to cast the defendant

from the court's jurisdiction *without treatment.* Herein, we are left with the means of providing for defendant's treatment, which truly is in his best interest and in the interest of justice.

*"(g) the impact of a dismissal on the confidence of the public in the criminal justice system" (CPL 210.40 [1] [g])*

Weighing the nature of the crime charged and the time defendant has already spent incarcerated against defendant's multiple disabilities, as profoundly pointed out by defense counsel, the public's confidence would be strengthened if the court exercises compassion by dismissing the felony charges in the indictment.

*"(h) the impact of a dismissal on the safety or welfare of the community" (CPL 210.40 [1] [h])*

The interests of society would best be served by placing defendant in a treatment program. The taxpayers' dollars would be used more effectively by trying to help this defendant, rather than incarcerating him for a longer period of time. If Steven Brooks served time in an upstate prison, his problems would still exist, manifestly his lack of social integration.

Paragraphs (e), (i) and (j) of CPL 210.40 (1) need not be covered as they are either inapplicable or the relevant factors have been addressed in the entirety of this decision.

For the numerous reasons stated herein, justice will be served by a dismissal of counts one and two in the indictment for the charges of burglary in the third degree and criminal mischief in the third degree, pursuant to CPL 210.40 (1).